[No. 10148–3–II.  Division Two.  April 12, 1988.]

ITT RAYONIER, INC., *Respondent,* v. ARTHUR BELL, ET AL, *Petitioners.*

*John H. Doherty* and *Doherty, Doherty & Ritchie,* for petitioners.

*John W. Phillips* and *Wickwire, Goldmark & Schorr,* for respondent.

ALEXANDER, J.—This court accepted discretionary review of a partial summary judgment granted by the Superior Court for Clallam County. The judgment dismissed Arthur Bell's claim of title to land by adverse possession and quieted title in ITT Rayonier, Inc. Bell contends, on review, that the trial court erred in concluding that there was no genuine issue of material fact concerning the exclusivity element necessary to a claim of adverse possession. We affirm.

ITT Rayonier, Inc., filed a complaint against Bell in the Clallam County Superior Court, seeking to quiet title to land in that County. ITT Rayonier also sought to eject Bell from the land and to obtain damages for trespass. Bell answered the complaint and alleged affirmatively that he had acquired title to the property by adverse possession. Bell has never asserted that he has record title to the property.

ITT Rayonier moved for a partial summary judgment on the quiet title issue. Three affidavits, Bell's deposition and

five "certificates"[1] were considered by the trial court at the summary judgment hearing.[2] The trial court granted the relief sought by ITT Rayonier, concluding that, although there were genuine issues of material fact concerning three of the four elements of adverse possession, there was no genuine factual issue on the element of the "exclusivity" of Bell's possession of the subject property.

We are confronted with one question. Did the trial court err in granting partial summary judgment to ITT Rayonier?

Summary judgment should be granted only if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "A 'material fact' is one on which the litigation's outcome depends." *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 511, 598 P.2d 1358 (1979).

When considering a summary judgment motion, the trial court must look at the evidence in a light most favorable to the nonmoving party. *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977). If reasonable people could reach different conclusions when considering the facts, the motion for summary judgment must be denied. *Jacobsen v. State, supra.* However, if reasonable minds could reach only one conclusion as to a question of fact, the question may be resolved as a matter of law. *Trane Co. v. Brown–Johnston, Inc.*, 48 Wn. App. 511, 513, 739 P.2d 737 (1987). In reviewing the disposition of a motion for summary judgment, the appellate court engages in the same inquiry as the trial

---

[1] The "certificates" were letters from various persons, given in support of Bell's position. Although they were not verified, the trial court apparently considered them in ruling on the summary judgment motion. *See* RCW 9A.72.085.

[2] Bell's counsel argues that the trial court erred in not considering ITT Rayonier's complaint in ruling on the summary judgment motion. While it is true that the order of partial summary judgment does not contain any specific indication that the trial court considered Bell's complaint, it is of no significance. Bell's counsel conceded at argument before this court that the trial court understood Bell's theory. That being the case, we fail to see how Bell was prejudiced even if the trial court ignored the complaint.

court. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Viewing the evidence presented to the trial court most favorably to Bell, the following facts emerge: In the early 1970's, Bell purchased a houseboat which had been moored for some time to the land here in question. The houseboat was located in a remote part of Lake Ozette where the Big River empties into the lake. Bell maintained the boat in approximately the same location throughout the time material to this lawsuit. The houseboat was secured to the land by two ropes which were attached to trees on the subject land. The houseboat and land to which it was secured were inaccessible by road and, consequently, Bell could reach the property only by path or boat.

Bell resided in the houseboat frequently from the time he acquired it until 1985. During the approximately 12 years that he resided on the houseboat,[3] Bell conducted considerable activities on the abutting land, with which we are here concerned. During this period, he built a fire pit, a woodshed and an outhouse. In addition, he developed an herb garden and a vegetable garden on the property, as well as a potato patch. He also tended other parts of the property and even maintained a lawn on the property during a portion of the time. He attempted to construct a sauna bath, but it was never completed. The portion of the structure which was completed eventually "rotted away."

Bell's houseboat was not the only houseboat in the area. Claude Olesen and L. W. Klock also moored a houseboat in the same vicinity for approximately 20 years. Their houseboat was "moored adjacent" to Bell's houseboat. Olesen and Klock both indicated that when they occupied their houseboat they used the adjacent land for digging a hole for an outhouse and other minimal uses associated with the occupancy of the houseboat. They indicated that Bell never attempted to exclude them from the subject property.

---

[3]Bell actually lived on the houseboat, although he stayed overnight on the subject property several times.

Bell did not deny that Olesen and Klock used the same land, although he said they used the land only one to three times a year. When asked in a deposition whether other people had the right to use the property, Bell answered: "I suppose they did." When he was asked if he ever attempted to "throw anyone off the property," he responded that he had not done so, except for the "lady" who rented this houseboat. He indicated that he evicted her from the houseboat for nonpayment of rent. Finally, he was asked if "it was your understanding that other people could use the property if they wanted to?" He answered, "when I was there they—I didn't think somebody was going to come up and go camping right there. But I suppose if they tried to, I wouldn't have said anything to them."

■ Even viewing this evidence in a light most favorable to Bell, it is apparent that the exclusive possession that is required for adverse possession is lacking. A party seeking to establish a claim of adverse possession must show that his possession of the claimed property was exclusive in addition to being actual and uninterrupted, open and notorious, and hostile and under a claim of right made in good faith. *Chaplin v. Sanders,* 100 Wn.2d 853, 857, 676 P.2d 431 (1984).

The trial court, as we have noted already, found genuine fact issues on all of the necessary elements except for exclusivity. We agree with the trial court that Bell's use of the property, though considerable, was not exclusive. The facts are that Klock and Olesen used the same land as Bell and Bell did not interfere with their use of it. Indeed, Bell concedes in his deposition testimony that other people had the right to use the land. In its memorandum opinion, the trial court very succinctly set forth its views on the exclusivity issue. The remarks bear quotation:

> With regard to the element of exclusivity, the Defendant believed that others had the right to use the property, deposition of Defendant, 72:25–73:2; if others had tried to use the subject land, the Defendant would not have interfered, deposition of Defendant 74:4–74:9; the

adjacent houseboat owners have used the land that the Defendant claims, affidavits of Mr. Klock and Mr. Olesen; and the Defendant has erected no fence around the property that he claims and has set up no "no trespassing" signs, deposition of Defendant, 49:12–22. . . .

While possession of property by a party seeking to establish ownership of it by adverse possession need not be absolutely exclusive, "the possession must be of a type that would be expected of an owner . . ." *Crites v. Koch,* 49 Wn. App. 171, 174, 741 P.2d 1003 (1987). Bell's possession of the subject property is not of the type one would expect of an owner. The intrusion onto the land by Klock and Olesen cannot be said to be merely casual. The evidence shows that they moored their houseboat near the same property for a longer period than did Bell. During this period, they used the property in question along with Bell. Bell's acquiescence in their use of the land cannot be described to be simply the attitude of a good neighbor. It shows, rather, that there was a shared occupation of land. This does not constitute the exclusive use of land necessary for adverse possession and, in our judgment, reasonable persons could not conclude otherwise.

Even if we were to hold that there was a fact issue on the element of exclusivity, we would be inclined to affirm the trial court. This court can affirm the trial court on another ground if there is support in the record for such other ground. *Northern Pac. Ry. v. State Utils. & Transp. Comm'n,* 68 Wn.2d 915, 924, 416 P.2d 337 (1966). As we have observed above, another element of adverse possession is that the party seeking to acquire title to land by adverse possession must possess the land under a good faith claim of right. Bell concedes that at no time, prior to the time he claims his possession of the property ripened into title, did he believe that he had title to this property or any claim of right to it. He admits that he thought the property in question belonged to the State. He also admits that he paid no taxes on the property. It seems obvious, therefore, that his claim cannot be said to have been made in good faith.

■ We are not unmindful of the fairly recent case of *Chaplin v. Sanders, supra,* where our Supreme Court over-ruled a long line of Washington cases and indicated that "[t]he 'hostility/claim of right' element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period", and that the claimant's "subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination." *Chaplin,* 100 Wn.2d at 860, 861. However, we observe also that the *Chaplin* court did not indicate that the good faith of the possessor is no longer an element of adverse possession. To us, the question of whether or not one acts in good faith is a question that can only be answered by making a judgment about the actor's subjective belief. Although a person's objective acts may shed light on the person's state of mind, good faith is essentially a state of mind. In a case where a possessor of land concedes that he had no interest in the land and no claim of right, it defies logic to ignore his pronouncement about his subjective beliefs.[4] Consequently, we are inclined to apply, as the Supreme Court indicated we could in *Chaplin* at page 862, "traditional presumptions" of adverse possession to the extent that they are not inconsistent with the dictates of *Chaplin.* Holding in this case, as a matter of law, that Bell did not raise a genuine issue of fact on the question of his good faith claim of right

---

[4]If we were to conclude otherwise, it seems clear to us that we would be encouraging what is commonly called "squatting." In our judgment, this defies the traditional American belief that a squatter should not be able to profit from his trespass. *Howard v. Kunto,* 3 Wn. App. 393, 477 P.2d 210 (1970), *overruled in Chaplin v. Sanders,* 100 Wn.2d 853, 676 P.2d 431 (1984). Viewed another way, such a result is likely to penalize the public because it clearly puts a chilling effect on the willingness of owners of large tracts of vacant land to allow others to use their land for recreation purposes. If such landowners believe, as one might argue they should, in light of *Chaplin,* that their lack of diligence in patrolling their property and expelling trespassers may result in the loss of their land, they will be extremely reluctant to allow any use of their land. This would clearly not benefit the public at large.

to the property is, in our judgment, consistent with *Chaplin.* If we misconstrue the decision in that case, we encourage the Supreme Court to reexamine its decision.

We affirm.

REED, C.J., and WORSWICK, J., concur.

Reconsideration denied May 11, 1988.

Review granted by Supreme Court September 1, 1988.