[No. 55269–0.   En Banc.   June 15, 1989.]

ITT RAYONIER, INC., *Respondent,* v. ARTHUR BELL,
ET AL, *Petitioners.*

*Doherty, Doherty & Ritchie,* by *John H. Doherty,* for
petitioners.

*Heller, Ehrman, White & McAuliffe,* by *John W. Phillips,* for respondent.

PEARSON, J.—ITT Rayonier, Inc. (ITT), plaintiff, instituted this action to quiet title to property situated in Clallam County. In addition, ITT prayed for damages for trespass and for the ejectment of defendant Arthur Bell. Bell answered, alleging ITT was not entitled to judgment in its favor by reason of Bell's adverse possession of the property for a period greater than the statutory period of 10 years. Additionally, Bell counterclaimed against ITT praying for judgment quieting title in Bell. On July 8, 1986, the trial court entered partial summary judgment, quieting title in favor of ITT. The Court of Appeals affirmed. *ITT Rayonier, Inc. v. Bell,* 51 Wn. App. 124, 752 P.2d 398 (1988).

## FACTS

In 1972, Arthur Bell purchased a houseboat moored near the mouth of the Big River in Swan Bay on Lake Ozette. The property that is the subject of this action is directly adjacent to that moorage and was purchased by ITT in 1947. ITT, as owner of record, has paid the property taxes on the land in question continuously since its purchase. Bell admits that he never purchased any of the property involved in this action. Additionally, he concedes that he has never maintained any "No Trespassing" signs on the property, nor has he ever denoted any boundary with a fence or any other markers. A very rough approximation of the amount of land in question is one-half of an acre. Bell testified that he regularly occupies his houseboat in the spring, summer, and fall, and visits only occasionally during the winter months.

Bell testified that at the time he purchased the houseboat, he believed the adjacent land was owned by the State. When asked whether it was his understanding that other people could use the property, his response was, "[a]ctually when I—no, not really. When I was there they—I didn't think somebody was going to come up and go camping right

there. But I suppose if they tried to, I wouldn't have said anything to them."

According to further deposition testimony of Bell, at the time he purchased the houseboat it had been moored in the same location since approximately 1962. The houseboat was moored to the land initially via a cable, and subsequently via a rope tied to two trees. The record reveals that only the following structures have been situated on the property in question for the full statutory period: a woodshed that existed prior to Bell's purchase of the houseboat, a woodshed he began building in 1978, an abandoned sauna that has existed since 1973, and the remains of an outhouse built by Bell in 1972 that has occupied numerous sites on the property.

Other than 6 weeks in the summer of 1973, when the houseboat was moored in Boot Bay, approximately 2 miles from the disputed property, the houseboat has at all times been situated adjacent to the property both Bell and ITT presently claim.

Bell's deposition testimony further reveals that he was away from the property during the 1974–75, 1975–76, and 1976–77 school years, while he was teaching school in Nanana, Alaska. During the first and third winters, he allowed friends to use the houseboat occasionally. During the 1975–76 school term, he rented the houseboat for $30 per month. Bell returned to Lake Ozette each of the three summers, personally occupying his houseboat during those months.

Bell's houseboat is not the only one in the area. Two families, the Klocks and the Olesens, have co–owned a houseboat for approximately 20 years that floats adjacent to both Bell's houseboat and the disputed property. Mr. Klock, in a sworn affidavit, stated:

> When using the houseboat, I and my family have used the adjacent land for the purpose of digging a hole for an outhouse and for other minimal uses. I do not own the land next to my houseboat but have used it permissively over the last twenty years. Arthur Bell has never

attempted to exclude us from using the property nor has he attempted to claim the property as his own.

In addition, Mr. Olesen swore to an identical statement.

Gerald Schaefer, an employee of ITT, stated in his sworn affidavit that ITT owns 383,000 acres in eight counties in Washington state. Often ITT is absent from its land for long periods of time:

> In its normal management of its land, Rayonier often will not visit or use its lands for long periods of time. After property has been logged and planted, it is common for Rayonier not to visit the property for 15 years, at which point precommercial thinning occurs. After precommercial thinning, property is often left 30 to 35 years before timber becomes commercial. It is virtually impossible to patrol all of Rayonier's lands that are not undergoing logging operations.

## ANALYSIS

The doctrine of adverse possession arose at law, toward the aim of serving specific public policy concerns,

> that title to land should not long be in doubt, that society will benefit from someone's making use of land the owner leaves idle, and that third persons who come to regard the occupant as owner may be protected.

Stoebuck, *The Law of Adverse Possession in Washington,* 35 Wash. L. Rev. 53 (1960).

■ In order to establish a claim of adverse possession, there must be possession that is: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. *Chaplin v. Sanders,* 100 Wn.2d 853, 857, 676 P.2d 431 (1984). Possession of the property with each of the necessary concurrent elements must exist for the statutorily prescribed period of 10 years. RCW 4.16.020. As the presumption of possession is in the holder of legal title, *Peeples v. Port of Bellingham,* 93 Wn.2d 766, 773, 613 P.2d 1128 (1980), *overruled on other grounds in Chaplin v. Sanders, supra,* the party claiming to have adversely possessed the property has the burden of establishing the existence of each element. *Skansi v. Novak,* 84 Wash. 39, 44,

146 P. 160 (1915), *overruled on other grounds in Chaplin v. Sanders, supra.*

## EXCLUSIVE POSSESSION

We are asked whether summary judgment against the defendant was proper based on the defendant's failure to establish his exclusive possession of the disputed property for the statutory period.

Where the facts in an adverse possession case are not in dispute, whether the facts constitute adverse possession is for the court to determine as a matter of law. *Peeples v. Port of Bellingham, supra.*

Relying upon the deposition testimony of Bell and the affidavits of Klock and Olesen, the trial court held Bell had failed to establish that his possession of the property was exclusive. The Court of Appeals affirmed, holding Bell's shared use of the property with the Klocks and Olesens was not possession in the nature one would expect from an owner, and thus the exclusivity requirement had not been met:

> While possession of property by a party seeking to establish ownership of it by adverse possession need not be absolutely exclusive, "the possession must be of a type that would be expected of an owner . . ." Bell's possession of the subject property is not of the type one would expect of an owner. The intrusion onto the land by Klock and Olesen cannot be said to be merely casual. The evidence shows that they moored their houseboat near the same property for a longer period than did Bell. During this period, they used the property in question along with Bell. Bell's acquiescence in their use of the land cannot be described to be simply the attitude of a good neighbor. It shows, rather, that there was a shared occupation of land. This does not constitute the exclusive use of land necessary for adverse possession and, in our judgment, reasonable persons could not conclude otherwise.

(Citation omitted.) *ITT Rayonier, Inc. v. Bell,* 51 Wn. App. 124, 129, 752 P.2d 398 (1988). The Court of Appeals decision is in accord with another recent case from that court. In *Thompson v. Schlittenhart,* 47 Wn. App. 209, 734 P.2d

48, *review denied,* 108 Wn.2d 1019 (1987), the court held that the exclusivity element was lacking because the alleged adverse possessor had shared the use of the disputed area.

Nevertheless, by pointing to specific instances of his own use of the property, Bell attempts to establish his exclusive possession. Unfortunately, such an approach logically fails to negate instances of use by others. As this court has held, specific instances of property usage merely provide evidence of possession:

> Evidence of *use* is admissible because it is ordinarily an indication of *possession.* It is possession that is the ultimate fact to be ascertained. Exclusive dominion over land is the essence of possession, and it can exist in unused land if others have been excluded therefrom. A fence is the usual means relied upon to exclude strangers and establish the dominion and control characteristic of ownership.

*Wood v. Nelson,* 57 Wn.2d 539, 540, 358 P.2d 312 (1961).

Possession itself is established only if it is of such a character as a true owner would make considering the nature and location of the land in question. *Young v. New-bro,* 32 Wn.2d 141, 144–45, 200 P.2d 975 (1948), *overruled on other grounds in Chaplin v. Sanders, supra.* As quoted in *Wood v. Nelson, supra,* use alone does not necessarily constitute possession. The ultimate test is the exercise of dominion over the land in a manner consistent with actions a true owner would take. Thus, Bell's burden was to establish specific acts of use rising to the level of exclusive, legal possession. Unfortunately, while Bell recited certain improvements he had made in the property, he failed to state definitively the length of their existence. Thus, the record reflects that only a woodshed, a partially built and then abandoned sauna, and an outhouse have existed on the property for the full 10–year statutory period. As the Court of Appeals correctly held, Bell's shared and occasional use of the property simply did not rise to the level of exclusive possession indicative of a true owner for the

full statutory period. Accordingly, we affirm the Court of Appeals.

## GOOD FAITH

Having affirmed the trial court's partial summary judgment against Bell, the Court of Appeals nevertheless provided an alternative ground for its decision:

> [A]nother element of adverse possession is that the party seeking to acquire title to land by adverse possession must possess the land under a good faith claim of right. Bell concedes that at no time, prior to the time he claims his possession of the property ripened into title, did he believe that he had title to this property or any claim of right to it. . . .
>
> . . . Holding in this case, as a matter of law, that Bell did not raise a genuine issue of fact on the question of his good faith claim of right to the property is, in our judgment, consistent with *Chaplin.*

*ITT Rayonier, Inc.,* 51 Wn. App. at 129–31. This portion of the Court of Appeals decision is in error.

In *Chaplin v. Sanders,* 100 Wn.2d at 855, this court unanimously held that the adverse possessor's "subjective belief whether the land possessed is or is not his own and his intent to dispossess or not dispossess another are irrelevant to a finding of hostility." In so doing, this court expressly overruled cases dating back to 1896.

The Court of Appeals reasoned that the *Chaplin* decision did not specifically do away with the good faith element of adverse possession, and stated, "the question of whether or not one acts in good faith is a question that can only be answered by making a judgment about the actor's subjective belief." *ITT Rayonier, Inc.,* at 130. In a footnote, the court noted, "to conclude otherwise . . . we would be encouraging . . . 'squatting.'" *ITT Rayonier, Inc.,* at 130 n.4.

As stated, the doctrine of adverse possession was formulated at law to protect both those who knowingly appropriated the land of others, and those who honestly held the property in the belief that it was their own. 3 Am. Jur. 2d

*Adverse Possession* § 142 (1986). Twenty–four years before *Chaplin,* Professor Stoebuck suggested this court should return to the original formulation of the adverse possession doctrine:

Perhaps the reader will agree that the law would have been clearer and in the long run more useful to the people if Washington had never gone into the "subjective intent" business at all. . . . [T]he common law of England seems to have . . . had no such element to adverse possession. Adverse possession revolves around the character of possession, and it is difficult to see why a man's secret thoughts should have anything to do with it. Maybe the idea originated in a confusion of permission or agreement between owner and possessor with unilateral intent in the possessor's mind. Whatever the reason, the court could yet perform a service by doing away with any requirement of subjective intent, negative or affirmative. Since a man cannot by thoughts alone put himself in adverse possession, why should he be able to think himself out of it?

Stoebuck, *The Law of Adverse Possession in Washington,* 35 Wash. L. Rev. 53, 80 (1960).

■ Today, we reaffirm our commitment to the rule enunciated in *Chaplin v. Sanders, supra:*

The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination. Under this analysis, permission to occupy the land, given by the true title owner to the claimant or his predecessors in interest, will still operate to negate the element of hostility. The traditional presumptions still apply to the extent that they are not inconsistent with this ruling.

(Footnote and citations omitted.) *Chaplin v. Sanders,* 100 Wn.2d at 860–62. Accordingly, good faith no longer constitutes an element of adverse possession. Thus, we affirm the Court of Appeals on the basis of Bell's failure to establish

exclusive possession, and reverse the Court of Appeals alternative holding that Bell failed to establish a good faith claim to the property.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and SMITH, JJ., concur.

Reconsideration denied July 13, 1989.