[No. 15069-1-III.    Division Three.    April 10, 1997.]

DUANE R. STOKES, ET AL., *Appellants,* v. TERRIL L. KUMMER, ET AL., *Respondents.*

*R. Wayne Bjur* and *Bjur & Woodard,* for appellants.

*Richard T. Cole* and *Cone, Gilreath, Ellis, Cole & Korte,* for respondents.

SCHULTHEIS, J. — The court denied Duane Stokes, Sandra Baker, Terry Johnson and B.G. Knight's claim for ejectment and quieted title to three parcels of land used by brothers Terril Kummer, Arlan Kummer and Kevin Kummer for dryland wheat farming, based on their adverse possession of the fields for more than 10 years. The court also granted the brothers a 75-foot easement across Mr. Stokes's and Ms. Baker's property, for access between two of the fields. On appeal, Mr. Stokes, Ms. Baker and Mr. Knight contend the Kummers' use of field two was permissive at its inception, negating the element of hostility required to demonstrate adverse possession. Mr. Johnson contends the Kummers conceded his superior title in 1982 by not contesting an easement he granted to others and did not prove adverse possession for a sufficient period thereafter. All of the appellants contend biennial cropping of agricultural land is insufficient use to establish title by adverse possession. We affirm.

The property at issue in this case is in a fairly desolate part of Kittitas County, accessible only by a gravel county road. The region is rocky and arid, covered mostly with sagebrush and tumbleweeds. There are pockets or hummocks of soil, however, that are suitable for dry land wheat farming. Aerial photographs show the three fields at issue have been cultivated since at least 1954. Sometime during or before October 1971 the quarter section where these fields are located, the northeast one-quarter of Section 33, Township 17 North, Range 18 East, Willamette Meridian, and the quarter section immediately west, the northwest one-quarter of Section 33, Township 17 North, Range 18 East, Willamette Meridian, were divided into tracts of roughly 20 acres each. The platted subdivision,

known as the Valley View Ranch tracts, was not recorded. Nor was it surveyed, permanently staked or fenced. The appellants each own a Valley View Ranch tract underlying the three wheat fields that the Kummer brothers have been farming since 1976. See the field survey map attached as an appendix.

It is unclear from the record when Lawrence Hall began growing winter wheat in the area, but in 1953 he leased from Agnes C. Meagher "all that certain crop land owned by [her] and lying within a certain fenced area" in the northeast one-quarter of Section 33 to grow wheat. The lease was for four years, from October 1, 1953, to October 1, 1957. Mary Hall married Lawrence Hall in 1956 and in 1957 moved to the old homestead house on his property south of Umptanum Road and west of Durr Road. Mrs. Hall said that when she moved out to the property, Mr. Hall was farming the same fields across the road (Umptanum Road) that the Kummer brothers later farmed. Mr. Hall originally farmed some of the property north of the road for Estil Wright under a crop share agreement, but later bought that property.

On January 28, 1976, the Kummer brothers bought out the Halls. They acquired title to 2,540 acres, including that part of the northeast one-quarter of Section 33 lying south and east of Umptanum Road, and most of the northwest one-quarter of Section 34, which borders the Valley View Ranch tracts on the east. Mr. Hall drove them around the various fields on the property and also gave the Kummers a 1954 aerial photograph of the area. It shows numerous wheat fields, which are irregularly spaced and shaped due to uneven topography and soil.

In March 1976 the Kummers moved onto the property and began farming the same areas Mr. Hall had farmed, including the three fields just north of Umptanum Road. There were no fences, posts or other markers suggesting the northeast one-quarter of Section 33 had been divided into parcels. The Kummers have continuously harvested wheat from all their fields every other year, beginning in

1976—except one year in the early 1980s when they participated in a federal program and ended up harvesting in an odd year, 1981. During crop years they reseed the fields if necessary early in the season, spray later for weeds, harvest the wheat with a combine, and, when soil moisture permits, plow the stubble under in the fall. During the intervening fallow years, they plow, cultivate, fertilize and seed the fields. Every year the Kummers post the perimeters of their wheat fields against trespassing and hunting, and they regularly tell people to get off the land during hunting season.

Meanwhile, S & S Enterprises, Inc., was selling Valley View Ranch tracts. Duane Stokes acquired tract 40 in August 1988 by quitclaim deed from his parents, who had bought it in approximately 1972. When Mr. Stokes first visited the property in fall 1973, he observed most of it was sagebrush, but there was evidence the northern part had been farmed. It looked substantially the same when he next visited in fall 1980—he saw wheat stubble on the northern end. When he last visited in fall 1991 it looked the same, "like somebody had plowed the field."

Sandra Baker (nee Burchfield) acquired tract 41 in June 1973 by deed from S & S Enterprises, after her brother assigned her his interest under a 1971 purchase contract. She first visited the property shortly after she acquired it and was thoroughly unimpressed. It was dry, arid and rocky, covered with sagebrush and tumbleweeds. She visited the property again in the early 1980s, twice in one year, but she only looked at the tract from the road. She did not walk the property and could not see the northern part of it. She did the same thing once more later in the 1980s. Every visit was during winter. Until the lawsuit, she had never seen the north end of the property where the wheat fields extend onto it.

B.G. Knight acquired tract 36 in the 1970s from Melvin and Emma Orness, who deeded the tract to him in January 1980 in fulfillment of his contract with them and their 1971 purchase contract. He saw only a picture of the prop-

erty when he bought it, and it was apparent from the picture that it had been farmed. He learned about the Valley View Ranch tracts from Alex Varunok, a close friend and fellow Boeing employee, who had bought tracts 34 and 35.

In 1978 Mr. Varunok approached the Kummer brothers and told them they were farming on property north of Umptanum Road that did not belong to them. He showed them a deed and a map. After some discussion and correspondence between Terril Kummer and Mr. Varunok, they reached a lease agreement. On May 7, 1978, Mr. Varunok signed a handwritten "farm lease/share agreement," apparently drafted by him, in which Kevin Kummer agrees to farm tracts 35 and 36, belonging to Mr. Knight and Mr. Varunok, and to provide 25 percent of the gross proceeds of the 1978 and 1979 crops and thereafter $33^1/3$ percent. Mr. Knight signed on May 8 and Kevin Kummer signed on May 17 at the request of his brother Terril. Terril Kummer then returned the signed lease agreement to Mr. Varunok with a note advising him that they normally harvest wheat every other year, so the next crop after 1978 would likely be 1980.

On November 20, 1978, Terril Kummer sent Mr. Varunok a note and a check for $1,035. In August 1979 Terril Kummer sent Mr. Varunok a letter and newspaper article explaining they had had serious crop damage from grasshoppers. On November 1, 1981, Terril Kummer sent Mr. Varunok a note and a check for $1,810.90. In June 1983 the Kummers bought tracts 34 and 35 from Mr. Varunok. They continued farming field two as they always had, believing they now owned the tracts underlying it.

Mr. Knight received his share of the 1978 and 1981 lease payments from Mr. Varunok. He never met or talked with any of the Kummer brothers. Though he did not receive any payments after 1981, he did not ask Mr. Varunok about it. When Mr. Knight visited his property in winter 1982 or 1983, he noticed it had obviously been farmed in wheat because there was wheat stubble on part of it and

sagebrush on part. Mr. Knight visited his property probably once more in the 1980s and again in about 1991, both times in the winter. He said he assumed somebody would send him money if the Kummers farmed his property, and since he was not receiving any money, he concluded they must not be farming it. Mr. Knight did not try to contact the Kummers until approximately 1991 or 1992, when he learned from a realtor that his property was being farmed. At that time, he was unable to locate a telephone number for the Kummer brothers and did not pursue the matter further.

Finally, Mr. Johnson acquired tract 39 in December 1990 by quitclaim deed from his parents, who had bought it in September 1975 from the original purchasers, Derwin and Avis Lisk. Mr. Johnson first saw the property in 1975 just before the Lisks transferred it to his parents, and at that time, part of it was a wheat field, early fallow or stubble. Tract 39 is divided roughly into western and eastern halves by a road that provides access from Umptanum Road to the north. The road was not shown on the unrecorded plat map, but it was there when the Johnsons bought the tract and Milo England had been using it to get to his property ever since he bought his acreage in summer 1976.

Mr. England remembered the fields on either side of the road had been farmed when he moved there, and that the Kummers had farmed both fields since 1976. In fact, they crossed the road to get from one field to the other and, when they did not raise their tractor attachments high enough, they disturbed the already rough road surface. In October 1982 Mr. England contacted the Johnsons, after determining from county records that they owned tract 39, and asked if they knew their property was being farmed. They apparently did not. Terry Johnson visited the property and ascertained it was being farmed by the Kummers. He met with Mr. England and Earl and Lorna Lyon, who also used the road to get to their property, and on behalf of his parents gave them a recorded, handwritten easement to use the road.

Mr. Johnson also met with at least two of the Kummer brothers. He advised them he was giving the Englands and the Lyons an easement and discussed the Kummers' farming of his property. According to Mr. Johnson, he insisted the Kummers sign a written lease with him and agree to pay something for the crops they had taken in previous years, or he would not give them permission to continue farming. No agreement was reached, but the Kummers continued farming as they always had. Mr. Johnson returned in January or February 1987, and once again in winter 1990. Both times the property was just as it was when he first saw it in 1975. He did not contact Mr. England or the Kummers after October 1982.

The tract owners, all of whom live west of the Cascade Mountains, joined in this ejectment suit. The Kummers were served on January 12, 1994, and the summons and complaint were filed on March 18. They answered, and counterclaimed to quiet title in themselves under the doctrine of adverse possession. After a two-day bench trial in February 1995, the court quieted title to the three wheat fields in the Kummers and granted them a 75-foot easement across tracts 40 and 41 for access between fields one and two. The tract owners appeal.

## ADVERSE POSSESSION

In order to establish a claim of adverse possession, there must be possession that is (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile, all for a period of 10 years. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989); *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984); RCW 4.16.020. Because the presumption of possession is in the holder of legal title, the party claiming adverse possession has the burden of establishing each element. *ITT Rayonier*, 112 Wn.2d at 757. Adverse possession is a mixed question of law and fact. Whether essential facts exist is for the trier of fact; but whether the facts, as found, constitute adverse

possession is for the court to determine as a matter of law. *Chaplin*, 100 Wn.2d at 863.

## FIELD TWO

Tract owners Mr. Stokes, Mr. Knight and Ms. Baker contend the Kummers farmed field two, covering much of the Knight tract and a small portion of the Baker and Stokes tracts, after they received permission to do so under the May 1978 lease agreement. They assert permissive use is not hostile and does not commence the running of the prescriptive period. *Crites v. Koch*, 49 Wn. App. 171, 177, 741 P.2d 1005 (1987). They argue the permissive use of this wheat field could not ripen into a prescriptive right unless the Kummers made a distinct and positive assertion of a right hostile to the owners. *Id.* at 177.

■ As the Kummers point out, and the court found, Mr. Stokes and Ms. Baker were not privy to the lease and could not gain any benefit from it. The Kummers established they adversely possessed those parts of tracts 40 (Stokes) and 41 (Baker) that they and their predecessor Mr. Hall had farmed continuously from the 1950s into the 1990s, including the prescriptive easement granted by the court.

With respect to Mr. Knight, use of his property was not permissive at its inception, though it may have been from mid-1978 to mid-1983. The lease does not make it clear that Mr. Knight was the Kummers' landlord for any specific property, or that he owned one of the tracts outright. The court found the statutory period began running at the latest in June 1983, when the Kummers bought tracts 34 and 35 from Mr. Varunok.[1]

As the court pointed out in its memorandum decision, the assertion that the Kummers never repudiated the

---

[1]The tract owners assign error to the finding that the Kummers thought they were buying the 40 acres covered by the Varunok and Knight lease. The finding is supported by the evidence, although it is not necessary for a determination of adverse possession since it is irrelevant whether they appropriated the land knowingly or by mistake. *Chaplin*, 100 Wn.2d at 860.

lease is without merit. Apart from questions whether it was ever valid or whether it terminated with Mr. Varunok's sale of his tracts, the sale itself signaled a significant change in the parties' relationship. Mr. Varunok had handled all aspects of the lease arrangement, including paying Mr. Knight his share; Mr. Knight had never even spoken with any of the Kummer brothers. When Mr. Varunok advised Mr. Knight he was selling out, Mr. Knight was put on notice he would have to make different arrangements regarding the lease, which, as previously noted, did not specify his interest in any event. He did nothing. That fall, when he did not receive a lease payment, he again did nothing. He did nothing until this suit was commenced in January 1994 by service on the Kummers, and by then it was too late.

■ Possession is hostile when one holds property as his own, whether under mistaken belief or willfully. *Chaplin*, 100 Wn.2d at 860. Here, after they bought the two tracts upon which they thought their wheat field was located, the Kummers no longer made lease payments because they held the property as their own. They continued to farm it openly and they kept the proceeds from the crops. The Kummers' actions were of such open, notorious and hostile character that Mr. Knight would have known they were farming his land, had he looked or inquired.

FIELDS ONE AND THREE

Mr. Johnson contends the Kummers did not prove adverse possession for the requisite 10 years. First, he argues they did not establish tacking because Mr. Hall farmed the property under a 1953 lease and Mrs. Hall recalled he farmed some property north of Umptanum Road under a verbal agreement with another landowner. There was no evidence that Mr. Hall's occupancy was anything other than permissive; thus, if there was adverse possession it could not have begun before 1976.

The evidence establishes Mr. Hall farmed both fields

from 1957 to 1976, but it does not establish he did so under a lease or with other permission. The property descriptions in the 1953 lease and Mrs. Hall's deposition testimony are too vague to determine what property was covered. The evidence also does not establish Mr. Hall possessed the property adversely, except that the Johnsons never gave anyone permission to farm tract 39. Under these circumstances, the earliest the prescriptive period could begin was September 1975, when the Johnsons acquired their interest.

Second, Mr. Johnson argues the Kummers deferred to and acknowledged the superior title of Mr. Johnson to the tract 39 wheat fields in October 1982 when they permitted him to grant and record an easement to Mr. England and the Lyons.

From 1976 when they acquired their property from the Halls, the Kummers' use of fields one and three was open, notorious and hostile. By at least October 1982, Mr. Johnson had actual notice they were farming his land. He confronted them and told them he owned the property, wanted payment for crops already harvested, and would not allow them to continue farming his land unless they executed a written lease. Had the Kummers stopped farming, Mr. Johnson's actions would have interrupted their possession and restarted the prescriptive period. But they did not. They continued farming the fields just as if they owned them, not in a manner indicating recognition of or subordination to Mr. Johnson.

Mr. Johnson's grant of the easement was nothing more than permission for the Englands and the Lyons to use an existing road to access their properties. That did not interfere with or interrupt the Kummers' use of the fields on either side of the road. The Kummers' possession of the fields was (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile. Because he failed to effectively assert his own ownership over the fields (as opposed to the road) for more than 10 years after acquiring actual knowledge of the Kummers' adverse possession, Mr. Johnson lost his title.

Finally, the tract owners contend adverse possession cannot occur by cultivation of open farm land for crops harvested on a biennial basis when the land lies fallow in the intervening years.

■ ■ The contention is completely without merit. The use and occupancy of the property need only be of the character that a true owner would assert in view of its nature and location. *Chaplin*, 100 Wn.2d at 863. That requirement is easily met by the Kummers' dryland farming of these fields in precisely the same manner they farm the rest of their acreage in the area. Ample evidence, including the aerial maps and the testimony of some of these tract owners, demonstrates just how visible is the Kummers' use of the property. As the surveyor put it, when asked if he had any difficulty discerning the difference between the fields and the surrounding property: "It's either field or sagebrush."

The decision of the superior court is affirmed.

SWEENEY, C.J., and BROWN, J., concur.

Reconsideration denied May 15, 1997.

Review denied at 133 Wn.2d 1017 (1997).

694

KITTITAS COUNTY, WASHINGTON
DATED
EXHIBIT 13