IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MAXINE McCALLUM and GLENDON McCALLUM, | No. 86175-1-I |
| Respondents, | DIVISION ONE |
| v. | |
| COREY SMITH, | UNPUBLISHED OPINION |
| Appellant, | |
| ANGELA BLOCKI, | |
| Defendant. | |

SMITH, C.J. — Maxine and Glendon McCallum and Corey Smith own adjoining rural properties in Pierce County, Washington. In 2021, after learning that the fence separating their properties encroached onto their property, the McCallums sued to quiet title as to the disputed strips of land along the western and southern boundaries of their property. Smith asserted counterclaims of adverse possession and boundary by mutual recognition and acquiescence. After the parties moved for summary judgment, the trial court dismissed Smith's boundary by mutual recognition and acquiescence counterclaim as to the disputed southern strip. Following a three day bench trial on the disputed western strip, the court quieted title to the McCallums.

On appeal, Smith contends that the trial court erred by finding for the McCallums at summary judgment and at trial. Because Smith failed to provide

evidence sufficient to show that his predecessors in interest adversely possessed the disputed western strip or acquiesced to the boundary lines, we affirm.

FACTS

This case involves a boundary line dispute between Maxine and Glendon McCallum and Corey Smith, owners of adjoining rural properties in Pierce County, Washington. A diagram of the parties' respective properties and certain neighbors' properties is below:



Smith owns a single parcel of property, the "Smith Property." The McCallums own two parcels of property, the "McCallum Property," which borders the Smith Property to the east, and the "McCallum/Goetz Property," which borders the Smith Property to the south.

Because this case involves fact-specific claims, we begin with a brief history of the ownership and use of the properties.

History of Ownership and Use

1. Smith Property

In the early 1940s, Howard and Ella Freeman purchased the Smith Property. At the time, the property was fully enclosed by a barbed-wire fence. Sometime before 1955, Howard Freeman replaced the fence with a steel-post fence with field netting. In building the fence, the Freemans did not obtain a survey or speak to Mr. Rossa,[1] the then-owner of the McCallum Property. Around the same time, the Freemans installed a drainage system with an opening at the end of the now disputed western strip.

Until the 1970s, the Freemans operated a small dairy farm. During that time, Rossa allowed the Freemans to graze their cows and horses on portions of his land. The Freemans also cut a gate into the wire fence separating their property from Rossa's so that their cows and horses could roam freely between the properties. After they closed the dairy farm, the Freemans raised dairy cows until 1990. After the Freemans stopped keeping cows, they allowed another neighbor, Anton Fohn, to graze his cows on their property for a couple of summers. Fohn would let his cows freely roam between his property and the Freemans' property.

Howard and Ella Freeman lived on the Smith Property until their deaths in 2005 and 2009, respectively. After Ella's passing, the Smith Property passed to

---

[1] Neither of the parties, nor any of the witnesses, could remember Mr. Rossa's first name.

her estate. Ella's daughter, Donna Larsen, and grandson, David Larsen, then lived in a mobile home on the property.

From 2009 to around 2014, David[2] permitted neighbor Donald Lathrop to graze a few cows on the Smith Property. Lathrop would let his cows graze on the southern pasture for about four to six weeks out of the year. During this time, no one else was using or maintaining the disputed western strip. David also allowed Lathrop onto the property periodically to make repairs to the fence separating the Smith and McCallum Properties and to some interior fences on the Smith Property.

In 2013, Donna passed away. David moved away shortly thereafter in 2014. After David moved away, Lathrop stopped grazing his cows onto the Smith Property. However, about a month later, Lathrop observed a man mowing grass at the Smith Property and approached him, offering to mow the grass in exchange for being permitted to graze his cows. The man agreed, and Lathrop resumed letting his cows graze on the Smith Property for a month out of the year until mid-2015.

In mid-2015, Angela Blocki and Corey Smith purchased the Smith Property from the estate of Ella Freeman. Title to the property was acquired solely in Blocki's name. In October 2017, Blocki and Smith separated, but Smith remained living on the Smith Property. Smith and Blocki's final dissolution decree, entered in March 2018, awarded the Smith Property to Smith. Despite

---

[2] We refer to Donna Larson and David Larson by their first name solely for the purpose of clarity and to avoid any confusion.

4

being awarded the property, Smith did not take legal title of the property until June 2021.

2. <u>McCallum Property</u>

In the 1970s, Faith Dairy acquired the McCallum Property from Rossa. Faith Dairy was owned and operated by Geraldine Beukema's family, the Mensonides. From approximately 1970 until 1999, Faith Dairy used the McCallum Property as a secondary pasture, grazing their cows there for a few weeks over the summer before transporting them back to the main Faith Dairy facility across the street.

In the early 1980s, Faith Dairy and Fohn worked together to rebuild the fence separating their properties. In 1992, Geraldine and Cornelis Beukema moved onto the McCallum Property. Cornelis would occasionally help Fohn make repairs to the fence separating their properties; Cornelis also made repairs on his own at times without asking Fohn. The Beukemas obtained ownership of the property in 1999.

In 1999, Faith Dairy stopped grazing their cows on the McCallum Property. In lieu of cattle grazing, the Beukemas began growing hay, which they baled once a year. Between 2008 and 2010, when they were not growing hay, the Beukemas allowed Lathrop to graze his cows on portions of the property. In 2021, the Beukemas sold the McCallum Property to the McCallums.

### 3. McCallum/Goetz Property

The Freemans previously owned the McCallum/Goetz Property. In 2006, Jeffrey Goetz purchased the McCallum/Goetz Property from the Freemans. When Goetz acquired the property, it was already entirely fenced.

In 2013, Goetz obtained permission from Ella Freeman to replace the southern boundary fence. Goetz then rebuilt the fence about a foot south of the existing fence line. In May 2021, the McCallums purchased the McCallum/Goetz Property.

### Present Case

In 2021, after conducting a survey of their land, the McCallums learned that the fences separating their properties from the Smith Property encroached on their land by several feet on the western and southern boundaries. They subsequently sued to quiet title as to the disputed strips of land, for trespass and injury to land, for ejectment, and for declaratory and injunctive relief. In response, Smith alleged counterclaims of adverse possession and boundary by mutual recognition and acquiescence.

In early 2022, both parties moved for summary judgment. The trial court partially granted the McCallums' motion, quieting title and dismissing with prejudice Smith's counterclaims of adverse possession and boundary by mutual recognition and acquiescence as to the southern strip. The court reserved the parties' claims as to the western strip for trial.

In connection with their summary judgment motion, the McCallums requested an award of attorney fees. After reducing the requested amount by approximately $9,000, the court awarded the McCallums $31,763.75 in fees.

In June 2022, the parties proceeded to trial over the disputed western strip. At trial, several neighbors and witnesses testified that the fence had historically been used to separate the properties and to contain livestock. Neighbors also testified that the fence was old and falling apart and that no one knew or was particularly concerned about whether the fence was on the true boundary line. For example, neighbors Fohn, Lathrop, and Cornelis Beukema each testified that none of the neighbors had ever performed a survey of their properties to determine the true boundary lines.

Following trial, the court quieted title as to the western strip to the McCallums. The court denied Smith's claims for adverse possession and boundary by mutual recognition and acquiescence, concluding that Smith failed to satisfy the requirements for either claim. The court also ruled in favor of the McCallums on their claims for ejectment, declaratory relief, injunctive relief, and trespass and injury to land.

After trial, the McCallums again requested attorney fees. The court granted the McCallums' request and awarded them an additional $178,702.22 for a total fee award of $210,465.97.

Smith appeals.

7

ANALYSIS

On appeal, Smith contends that the court erred by dismissing his counterclaim of boundary by mutual acquiescence as to the disputed strips and by dismissing his counterclaim of adverse possession as to the western strip. Smith also asserts that the court erred in awarding the McCallums attorney fees at summary judgment and after trial. Each argument is addressed in turn.

Mutual Recognition and Acquiescence

To prevail on a claim of mutual recognition and acquiescence, a party must prove "(1) that the boundary line between two properties was 'certain, well defined, and in some fashion physically designated upon the ground, e.g., by monuments, roadways, fence lines, etc.'; (2) that the adjoining landowners, in the absence of an express boundary line agreement, manifested in good faith a mutual recognition of the designated boundary line as the true line; and (3) that mutual recognition of the boundary line continued for the period of time necessary to establish adverse possession (10 years)." Merriman v. Cokeley, 168 Wn.2d 627, 630, 230 P.3d 162 (2010) (quoting Lamm v. McTighe, 72 Wn.2d 587, 593, 434 P.2d 565 (1967)). All three elements must be proved by clear, cogent, and convincing evidence. Merriman, 168 Wn.2d at 630. To meet this standard of proof, the evidence must show that the ultimate facts are "highly probable." Merriman, 168 Wn.2d at 630-31.

1.  <u>Mutual Recognition and Acquiescence as to Southern Strip</u>

Smith asserts that the court erred in dismissing his claim of mutual recognition and acquiescence as to the disputed southern strip at summary judgment because a genuine issue of material fact existed as to each of the elements of the claim.  We disagree.

We review a trial court's grant of summary judgment de novo, considering the evidence and reasonable inferences drawn from it in the light most favorable to the nonmoving party.  <u>Keck v. Collins</u>, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).  Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  CR 56(c).  "A material fact is one that affects the outcome of the litigation."  <u>Owen v. Burlington N. & Santa Fe R.R. Co.</u>, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005).

*a.  Well-Defined Boundary Line*

Smith claims that it is indisputable that the fence is a well-defined line and that there was no evidence that the fence here was not.  We agree.  Exhibits admitted at trial showed that the fence is well-defined and easy to see.  Viewing the evidence in the light most favorable to Smith, the non-moving party, we conclude that this element is met.

*b.  Mutually Understood as Boundary, Not Barrier*

Smith maintains that the property owners treated the fence as the true boundary because Goetz testified that he considered the fence to be the true

9

boundary and because the Freemans' use of the property indicated as such. We disagree.

Property owners can manifest mutual recognition and acquiescence " 'by their acts, occupancy, and improvements with respect to their respective properties.' " Lilly v. Lynch, 88 Wn. App. 306, 316-17, 945 P.2d 727 (1997) (quoting Lamm, 72 Wn.2d at 593). " 'In the absence of an agreement to the effect that a fence between the properties shall be taken as a true boundary line, mere acquiescence in its existence is not sufficient to establish a claim of title to a disputed strip of ground.' " Lamm, 72 Wn.2d at 592 (quoting Thomas v. Harlan, 27 Wn.2d 512, 518, 178 P.2d 965 (1947)). Further, "[a]quiescence in a property line cannot be established by the unilateral acts of one party." Heriot v. Lewis, 35 Wn. App. 496, 501, 668 P.2d 589 (1983).

Here, only Goetz testified about the nature of the fence. Goetz relayed that he had never had his property surveyed or the boundaries staked. Goetz explained that he never asked Ella Freeman any questions about the boundaries of his property; they only spoke about Goetz's plans to replace the fence. Goetz also testified that he never had his property surveyed but assumed that the fence was the boundary line.

At most, Goetz's testimony portrays unilateral acts taken by one party with respect to the fence line. Although Smith alleges that the Freemans and their estate used the Smith Property up to the fence line in the manner of a true owner, Smith does not point to any evidence indicating that the Freemans used

10

the disputed strip or any testimony evidencing that the Freemans recognized the fence as the true boundary line. Instead, Smith claims that Lathrop's later use of the pasture was sufficient to show that the Freeman estate recognized and accepted the fence line as the property boundary. But Lathrop was not the owner of the Smith Property and cannot acquiesce to the boundary line. Without additional evidence, Goetz's testimony alone does not constitute clear, cogent, and convincing evidence that the Freemans and Goetz acquiesced in the fence as the true boundary line. Therefore, the trial court did not err in dismissing Smith's claim. Because Smith fails to meet this second element, we do not need to reach the third element, whether the boundary existed for 10 years.

2. Mutual Recognition and Acquiescence as to Western Strip

Smith avers that the court's findings of fact as to the western strip are not supported by substantial evidence. He also argues that the court's findings do not support the court's conclusion that Smith failed to satisfy the elements of mutual recognition and acquiescence. We disagree.

We review a trial court's findings of fact to determine whether substantial evidence supports the findings. Merriman, 168 Wn.2d at 631. Evidence is substantial if it is sufficient to persuade a fair-minded, rational person that the declared premise is true. Merriman, 168 Wn.2d at 631. "A reviewing court may not disturb findings of fact supported by substantial evidence even if there is conflicting evidence." Merriman, 168 Wn.2d at 631. If the court's findings are supported by substantial evidence, we then determine whether the findings

support the court's conclusions of law.  Green v. Hooper, 149 Wn. App. 627, 641, 205 P.3d 134 (2009).

### a. Well-Defined Boundary Line

Smith contends that the court's finding that the fence separating the McCallum Property from the Smith Property was "dilapidated" and "never completely established" is unsupported by substantial evidence because no witness testified as such.  Although witnesses testified that the fence was dilapidated, we agree with Smith that the court's finding that the fence was never completely established is unsupported by substantial evidence.

At trial, Fohn testified that the fence was "pretty dilapidated in places." Geraldine Beukema also testified that the fence "didn't look real good" and "wasn't like a neat fence."  Via deposition, Lathrop testified that the fence contained "a whole bunch of T posts along there, . . . some of them bent, some of them old, rusted, been there a long time."  Maxine McCallum also testified that Smith's animals would sometimes escape through the fence and end up on her property.  However, exhibits admitted at trial showing the current condition of the fence make clear that the fence is a well-defined line.  The photo exhibits show that the fence is easily seen, not covered in brush or otherwise obstructed, and still intact.  Although testimony at trial indicated that the fence was in a state of disrepair, no witness testified that the fence was in such disrepair that it was unclear if it existed or not.

Because testimony at trial indicated that the fence was established, the court's finding that the fence was not well-established is not supported by substantial evidence. And because this finding is not supported by substantial evidence, the court's conclusion that the fence was not a well-defined boundary line is not supported by the findings.

### b. Mutually Understood as Boundary

Smith next argues that the court's finding that the fence was primarily intended to contain livestock, rather than serve as a property boundary, is unsupported by substantial evidence because the property owners testified that the fence served the dual purpose of marking the boundary line and containing livestock. We disagree.

Geraldine Beukema testified that the fence was intended to "divide[] the property, to keep [the] cows out and to keep other people's animals in their location." Cornelis Beukema testified that the only purpose of the fence was "to keep the cows in" but that he considered the fence as the boundary line. Cornelis also testified that there was never an agreement between the Beukemas and the Freemans that the fence was the boundary line. He also stated that he could not remember ever seeing the Freemans using the land on their immediate side of the fence line. Fohn also testified that he believed the primary purpose of the fence was to keep animals from wandering onto other neighbors' property. Third party Sandy Arend-Johnson testified that Howard Freeman never told her about the purpose of the fence.

This testimony supports the court's finding that the primary purpose of the fence was to contain livestock. Smith's assertion that the court erred because there was also evidence supporting that the fence was a boundary line is unpersuasive. We do not reweigh evidence or credibility on appeal. City of Sunnyside v. Gonzalez, 188 Wn.2d 600, 612, 398 P.3d 1078 (2017).

Smith also claims that the court's finding that the Freemans did not treat the fence as the boundary because they "never built, constructed, planted, or cultivated anything in the Disputed Strip" is unsupported by substantial evidence because it ignores evidence that the Freemans' livestock used that portion of the property. Via deposition, Ronald Freeman, son of Ella and Howard Freeman testified that in the early 1950s, his father built a drainage system on the property with an entrance on the western boundary by the fence line. He also testified that besides letting their cows and horses roam, his family did not use the disputed western strip. Also via deposition, Fohn testified that since he had moved onto the property north of the Freemans in the 1960s, he never saw the Freemans build any structures near the fence line, or plant or cultivate any crops near that area.

At trial, Fohn testified that up until the 1990s, he witnessed the Freemans occasionally drive their tractor and wagon to get firewood and brush hog[3] the field twice a year. Lathrop testified that between 2005 and 2009, he never saw the Freemans doing any sort of maintenance or repair work on the western fence

---

[3] Brush hogging is trimming thick brush with a rotary cutting deck attached to a tractor.

line because they were "very elderly." Lathrop also testified that the Freemans' horses passed away sometime between 2002 and 2009 and that they did not have other animals on the property after that time.

This testimony also supports the court's finding that the fence was not treated as a true boundary line by the property owners.

Because the court's finding that the fence's primary purpose was to contain livestock, rather than act as a true boundary line, was supported by substantial evidence, the court's conclusion that the property owners did not acquiesce to the fence as a boundary line is supported by the court's findings. Because the property owners did not consider the fence to be the true boundary line, Smith's claim of mutual recognition and acquiescence fails.

Adverse Possession

In the alternative, Smith asserts that the trial court erred by dismissing his claim of adverse possession as to the western boundary. Smith claims that the Freemans' use of the property satisfied the elements of adverse possession and that their title to the disputed strip vested no later than 1970. Because Smith fails to provide sufficient evidence to show that the Freemans adversely possessed the western strip, we disagree.

To prevail on a claim of adverse possession, a party must show that the possession is (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. ITT Rayonier, Inc. v. Bell, 112 Wn.2d 754, 757, 774 P.2d 6 (1989). Each of these elements must exist for the statutorily prescribed period of

10 years. ITT Rayonier, 112 Wn.2d at 757. "Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period." Gorman v. City of Woodinville, 175 Wn.2d 68, 72, 283 P.3d 1082 (2012).

"As the presumption of possession is in the holder of legal title, the party claiming to have adversely possessed the property has the burden of establishing the existence of each element." ITT Rayonier, 112 Wn.2d at 757. "Possession itself is established only if it is of such a character as a true owner would make considering the nature and location of the land in question." ITT Rayonier, 122 Wn.2d at 759. For example, "[t]he construction and maintenance of a structure partially on the land of another almost necessarily is exclusive, actual and uninterrupted, open and notorious, hostile and made under a claim of right." Drazst v. Naccarato, 146 Wn. App. 536, 542, 192 P.3d 921 (2008). "Where there is privity between successive occupants holding continuously and adversely to the true title holder, the successive periods of occupation may be tacked to each other to compute the required 10-year period of adverse holding." Roy v. Cunningham, 46 Wn. App. 409, 413, 731 P.2d 526 (1986). "To interrupt adverse possession, there must be actual cessation of the possession." Ofuasia v. Smurr, 198 Wn. App. 133, 144, 392 P.3d 1148 (2017).

Here, Smith asserts that the Freemans adversely possessed the western strip and that their title to the disputed strip vested no later than 1970. Because the trial court's finding that there was insufficient evidence that the Freemans

16

sufficiently used the disputed strip is supported by substantial evidence, and the testimony supports that the use was by mutual agreement, we disagree.

Ronald Freeman testified that he lived on the Smith Property as a child in the 1940s and 1950s. Between 1958 and 1962, Ronald attended a technical college in Chicago, Illinois. After that, Ronald moved home to the Smith Property for approximately two years before he accepted a job in Rapid City, South Dakota, where he stayed for the following seven years.

Ronald testified that in the early 1950s, his father built a drainage system on the property with an entrance on the western boundary by the fence line. Ronald also testified that while he lived on the Smith Property, Rossa, the then-owner of the McCallum Property, told the Freemans that they could use his property to graze their horses and cows. Ronald described that they would pull back a portion of the fence between the Smith and McCallum Properties to allow the livestock to move back and forth between the fields and that "[s]ometimes [they] left the fence open, gate open, for months, if not years."

Ronald also testified that besides the cows and horses, his family did not make use of the disputed western strip, such as by tilling the land by the western fence. As to whether his father asked Rossa's permission before replacing the fence between the properties, Ronald stated that he did not know if his father and Rossa discussed the fence. Ronald also noted that he had never had any discussion with Rossa about the location of the boundary line.

Fohn moved to the property north of the Freemans in 1960, when he was six years old. He testified that he never saw the Freemans build any structures near the fence line, or plant or cultivate any crops near that area. He also testified that he did not know if the Freemans obtained a survey of their property and that he had never had a conversation with the Freemans about their property boundary lines. When asked whether he'd discussed the fence with Howard Freeman, Fohn said he could not specifically recall speaking to Freeman about the fence, but that he assumed Freeman built the fence "because they had cows."

No other witnesses testified as to this time period. However, Fohn and Ronald's testimony supported that the Freemans never built, constructed, planted, or cultivated anything in the disputed western strip. Other than this testimony that the Freemans' cows and horses grazed along the fence line, Smith produced no other evidence indicating that the Freemans used the western strip between 1940 and 1970 in a manner consistent with adverse possession. Rather, the testimony available supported that the Freemans' use of the western strip was by agreement with the true owner of the land. This limited testimony constitutes substantial evidence sufficient to support the court's finding that there was insufficient evidence of adverse possession.

<u>Attorney Fees</u>

Smith argues that the trial court abused its discretion in awarding the McCallums their attorney fees because the award was inequitable. Smith also

contends that fees are not awardable for claims of mutual recognition and acquiescence and that the court further abused its discretion by not segregating these fees out of the fee award.[4]  Both parties request fees on appeal under RCW 7.28.083(3).

We apply a two-part standard of review to a trial court's award or denial of attorney fees.  Park Place Motors, Ltd. v. Elite Cornerstone Constr., LLC, 18 Wn. App. 2d 748, 753, 493 P.3d 136 (2021).  First, we review de novo whether there is a legal basis to award attorney fees by statute, contract, or in equity.  Park Place Motors, 18 Wn. App. 2d at 753.  Next, we review the court's decision to award or deny fees and the reasonableness of the resulting award for an abuse of discretion.  Park Place Motors, 18 Wn. App. 2d at 753.

RCW 7.28.083(3) provides that "[t]he prevailing party in an action asserting title to real property by adverse possession may request the court to award costs and reasonable attorneys' fees."  It also states that "[t]he court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just."  RCW 7.28.083(3).  The statute does not mention claims for mutual recognition and acquiescence.

---

[4]  In his notice of appeal, Smith references only the court's first fee award order, entered on May 4, 2022.  Smith does not appeal the court's second fee award order, entered on March 17, 2023.  Despite this omission, we address Smith's argument about the second fee award because the parties proceed on appeal as though the order was appealed.

Here, the court cited RCW 7.28.083(3) as its authority for awarding fees. The court also noted that Smith's counterclaim of adverse possession was "inextricably linked with the other legal claims and theories in this case such that the time [spent by the McCallums' counsel] cannot be separated." Because the statute does not permit the court to award fees for claims for mutual recognition and acquiescence and the court acknowledged that some time was spent on those claims, it was not just and equitable and was error for the court to not adjust the award accordingly. Even if the time spent on each claim could not be separated, the court could have and should have lowered the award on the basis of equity. On remand, the court is instructed to lower the attorney fee award accordingly.

On appeal, the McCallums request attorney fees per RCW 7.28.083(3). Because an award of fees is discretionary on appeal and because the McCallums have already recouped a substantial amount of fees, we decline to award them additional fees.

Affirmed and remanded for the court to adjust the attorney fee award.

Smith, C.J.

WE CONCUR:

Birk, J.

Mann, J.

20