[No. 30288. Department One. December 4, 1947.]

CARL H. SKOOG *et al., Respondents,* v. AUGUST SEYMOUR *et al., Appellants.*[1]

*Metzler, McCormick & Metzler,* for appellants.

*Rummel & Skoog,* for respondents.

[1]Reported in 187 P. (2d) 304.

HILL, J.—Record title to lot 4, block 88, "Byrd's Addition to Tacoma City," is vested in the appellants, August Seymour and wife. They also claim title, by adverse possession, to the north 3½ feet of lot 5, which is adjacent to and immediately south of lot 4.

Record title to all of lot 5 is vested in the respondents, Carl H. Skoog and wife, and this action was commenced by them to quiet their title to all of lot 5 except a tract 16 inches north and south by 25 feet east and west actually occupied, since 1920, by the garage which is part of the house erected in that year on lot 4. The respondents and their predecessors in interest have at all times paid taxes on all of lot 5; hence the appellants, to establish adverse possession, were compelled to prove that their possession was actual and uninterrupted, open and notorious, hostile and exclusive, under a claim of right made in good faith for the statutory period, which in this case is ten years.

As the trial court said in its memorandum opinion, there is no dispute as to the applicable law, the real question being whether the use by the appellants and their predecessors in interest was of such character as to establish title by adverse possession. The trial court was of the opinion that

". . . the use which defendants [appellants] and their predecessors made of the strip did not constitute open, notorious and exclusive possession under a claim of right for ten years,"

and entered judgment quieting title in the respondents to all of lot 5 except the portion actually occupied by the garage.

The record owners of these lots during the period that is of significance here, and the approximate dates of certain events during that period, are here set forth, in the belief that they will assist in a better understanding of the testimony hereinafter referred to:

| Lot 4 | Lot 5 |
|---|---|
| Thorsk, 1919-1937 | Eierman, —— -1924 |
| House and garage built 1920 | |
| | Smart, 1924-1935 |
| | House built 1927 |
| | Stone wall built 1928 or 1929 |
| | Davidson, 1935-1937 |
| Duenwald, 1937-1944 | Lindenau, 1937-1946 |
| Seymour, 1944- —— | |
| | Skoog, 1946- —— |

It will be noted that the house and garage on lot 4 was built in 1920, the house on lot 5 in 1927, and the stone wall which figures so much in the testimony, in 1928 or 1929.

For the purpose of our discussion, the 3½-foot strip in controversy may be divided into three sections: section A, the easterly 60 feet; section B, the westerly 56 feet; and section C, an extension of the 3½-foot strip from the westerly lot line to the easterly curb of Union avenue, a distance of some 56 feet.

Along the south line of section A is a stone wall, built in 1928 or 1929 by L. R. Smart, a predecessor in interest of the respondents. Mr. Smart is dead, so we have no direct evidence as to his intention in building the wall. The character of the terrain is such that the top of the wall practically coincides with the level of the ground to the south, and, at its most easterly point, the wall rises some 7½ feet above the ground to the north. As it extends westward the wall is lower, until the level of the ground to the south thereof coincides with that to the north of it, at a point some 60 feet west of the east line of the lots, and there the wall ends.

The respondents take the position that this was intended as a retaining wall and not a boundary wall. The only attempted explanation of the fact that the builder erected the wall more than three feet south of his north lot line is the suggestion in the brief that he left that much clearance for the purpose of inspection and repair. There is no evidence that the respondents or any of their predecessors in interest

have ever used the strip north of the wall, for the purpose of inspection and repair or for any other purpose. The trial court's finding that the stone wall "was not intended to constitute a boundary line" is without evidence to support it.

Although part of the easterly 60 feet of lot 4 and of the strip was, some of the time at least, in a rather rough and wild state, it is clear from the evidence that, since the construction of this wall, the owners of lot 4 have used all of the 3½-foot strip lying north of the wall as they have used the rest of their property. There is testimony by Leonard A. Johnson, a gardener, that he worked for the owners of both lot 5 and lot 4. When he worked for the Davidsons (predecessors of the respondents), he worked south of and to that wall; when he worked for the Thorsks and the Duenwalds (predecessors of the appellants), he worked north of and to that wall. There is testimony that the Thorsks and the Duenwalds used the land up to the wall, and that Mrs. Duenwald had flowers growing in the wall. Mrs. Virginia Hennig, who had lived on lot 3, immediately north of lot 4, at all times since 1920, testified that the wall was known as a boundary line; and we get the inference from the testimony of C. H. Schartow, who lived on lot 1 (farther north in the same block) from 1920 to 1935, that it was regarded as a boundary line. We find that the Thorsks and the Duenwalds so regarded it.

The trial court stated, in its memorandum opinion, that the portion of the strip north of the wall

". . . has vines and shrubbery on it; also a small evergreen, spruce and lilac trees, as indicated on the map. These have been wholly cultivated and cared for by the defendants [appellants] and their predecessors since the wall was built."

We quote this to show that there was no doubt in the mind of the trial judge that section A was occupied and used by the Thorsks, Duenwalds, and appellants since 1928 or 1929.

Section B is that portion of the strip extending from the westerly end of the stone wall to the westerly lot line. It is established that along the south line of section B there were

loose rocks which represented a continuation of the line of the stone wall for a considerable distance westward. Mr. Lindenau, a predecessor in interest of the respondents, testified that these rocks were laid end to end on top of the ground, and that he never did any cultivating or any work north of the rocks. The gardener, Mr. Johnson, who worked on the premises between 1928 and 1935, described these rocks by saying that the stone wall "graduated up until it was not much of a wall up at all at the top. Just a few small stones," and it extended almost up to the projection of the garage. (We assume he meant the projection of the west wall of the garage.)

The garage which is part of the house on lot 4 has, at all times since its erection in 1920, projected 16 inches onto the strip for a distance of 25 feet, or almost half the length of section B. There was a drain pipe south of the house and parallel thereto which projected still farther onto the strip. Fireplace wood was carried along the south side of the garage and thrown or piled in the area east of the garage. Mr. Schartow testified that the strip immediately south of the garage was used as a passageway at all times, and that Mr. Thorsk considered that he had clearance of two or three feet to the south.

To us, some the most important testimony has to do with what we have referred to as section C, which is a continuation of the 3½-foot strip from the west property line to the east curb line on Union avenue, a distance of some 56 feet. We recognize that this 56-foot strip is part of the street and belongs to the city, and that no title by adverse possession could be acquired to any portion thereof. Because of that fact, the trial court apparently disregarded the evidence concerning section C.

The extensive area between the property line and the sidewalk and curb line in block 88 apparently was used and beautified by the property owners as though it belonged to them. The evidence shows that the south line of the driveway established by the Thorsks either coincided with or was somewhat south of the north line of the 3½-foot strip.

It is undisputed that the Thorsks, Duenwalds, and appellants had cultivated and cared for a strip south of the driveway. The Duenwalds had replaced shrubs planted by the Thorsks in that strip with boxwood, and Mr. Lindenau testified that when the appellants, in turn, removed the boxwood, he made no objection because

"... it did not concern us. I was not concerned with that piece of property there. .... I did not take care of the property up to his driveway."

His testimony was that he did take care of the property south of the driveway to a point six or eight inches north of a row of shrubs shown on exhibit No. 1. If that be so, he certainly did not take care of any portion of section C.

Both the Lindenaus and the Duenwalds moved onto their respective properties in 1937 and within the ten-year period prior to the commencement of the action, but the Duenwalds testified that when they put in the boxwood they removed shrubs which the Thorsks had planted, and that they maintained the line as pointed out to them by the Thorsks. This was corroborated by other witnesses. The boxwood was on a line with the stone wall which marks the south line of section A, and with the rocks which partially mark the south line of section B. It was also established that the south line of the concrete apron of the driveway, as it comes up over the curb, practically coincides with the south line of the strip in question.

From the easterly line of lot 5 to the curb of Union avenue, 172 feet and more away, there was a continuous visible line made up of a stone wall, loose rocks, and shrubs, broken only for a distance of some 25 or 30 feet immediately south of the garage, and that portion of the strip had been used at all times as a passageway from the front of the house and garage to the rear thereof. The appellants and their predecessors in interest had cultivated and cared for everything north of that line and had done everything that anyone would do with property of that character, short of building a fence, to indicate that they claimed title to that line. The evidence concerning the use of sections A and B

by the appellants and their predecessors in interest is corroborated and supported by the evidence concerning their use of section C, which is a prolongation of the same strip. The evidence in its entirety shows use of part of this strip by the appellants and their predecessors, beginning in 1920 with the erection by the Thorsks of their house and garage, and continuing subsequent to 1928 or 1929, to everything north of the stone wall and the line thereof projected to the curb on Union avenue.

We find no Washington cases limiting the adverse possession of the owner of residential property who had built across his true line, to the actual ground area occupied by the house, as was done in this case. The trial court apparently overlooked the significance of the construction of the house and garage as evidence of an open and notorious claim of adverse possession to so much of lot 5 as might be necessary to the convenient use and access thereto, especially where the builder of the house and his successors in interest actually exercised dominion over the land required for that purpose for more than the statutory period.

Attention is directed to *Erickson v. Murlin,* 39 Wash. 43, 80 Pac. 853, where the strip in question was 21 inches in width along the whole line of a lot 120 feet in depth. The house had been erected so close to the strip that water dripping from the eaves fell upon the 21 inches in dispute. Except for the portion of the 21-inch strip on which the drip of the eaves fell, there was nothing distinctive about the use to which the strip was put. We find nothing to distinguish that case from the present, except that the strip was narrower and was enclosed within a fence for the entire length of the lot.

The respondents seem to contend that there can be no adverse possession of residential property unless it is fenced. They insist that some act such as fencing the property claimed is necessary to give actual notice to the true owners that someone is claiming their property adversely; and that the absence of a fence distinguishes the present case from

all other Washington cases. They rely upon the frequently quoted rule that:

"The disseisor 'must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest.'" 1 R. C. L. 693.

It is difficult to conceive of any more conspicuous "unfurling of the flag" than the erection of a house on the tract in question, the use of a strip 26 inches beyond the south wall of that house for a drain pipe and passageway, and the care and cultivation of that strip for the entire length of the line and across city property for an additional 56 feet to the curb line of the street. Mr. Lindenau, a predecessor in interest of the respondents, testified:

"I didn't know the property line was under his house. I just assumed that it was somewhere outside of the house, and that was good enough."

It seems to us that this was a very reasonable assumption. It should be apparent to any property owner in a residential district that the owner of the adjoining property claims that his property line is "somewhere outside of the house." And if he plants shrubs in and takes care of and uses a strip lying approximately two feet beyond the wall of that house for the full length of his lot in such a way as property of like nature would be used, it would seem that any neighbor should "assume" that he was claiming that 2-foot strip.

In *Downie v. Renton*, 167 Wash. 374, 9 P. (2d) 372, we quoted with approval from 1 R. C. L. 700, the following statement:

" 'The words "open and notorious possession," as applied to the adverse holding of land by another, mean that the disseisor's claim of ownership must be evidenced by such acts and conduct as are sufficient to put a man of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own. . . . It is, therefore, essential in all cases that the owner shall have notice to that effect. If he has actual notice that will, of course, be sufficient in itself. Where, however, there has been no actual notice, it is necessary to show that the possession of his dis-

seisor was so open, notorious, and visible, as to warrant the inference that the owner must, or should, have known of it; otherwise a mere trespass might be evidence of ouster' ";

to which might well have been added, from 1 R. C. L. 700, two sentences which immediately follow the above:

"It will be presumed that the owner knew of a possession which was openly, notoriously, and visibly maintained for the statutory period. For the purpose of showing such a possession it is competent to prove the exercise of acts of ownership by the disseisor."

We are of the opinion that any man of ordinary prudence must have known that the Thorsks and their successors in interest were claiming the strip here in question. They were making the same use of the strip that they were making of their own property, and the use that any owner might be expected to make. For somewhat similar situations, see *Erickson v. Murlin, supra; Thornely v. Andrews,* 45 Wash. 413, 88 Pac. 757; *McCormick v. Sorenson,* 58 Wash. 107, 107 Pac. 1055; *King v. Bassindale,* 127 Wash. 189, 220 Pac. 777; *Foote v. Kearney,* 157 Wash. 681, 290 Pac. 226.

*Smith v. Chambers,* 112 Wash. 600, 192 Pac. 891, on which respondents rely, is not in point, because both parties in that case were using portions of the disputed strip from time to time, and, at the first evidence of an intention by one party to claim an exclusive right therein, the other immediately resorted to court proceedings challenging that right.

Nor is *Peoples Sav. Bank v. Bufford,* 90 Wash. 204, 155 Pac. 1068, to which respondents devote five pages of their brief, of any assistance to them. The case is a most unusual one on its facts. Bufford owned lot 5 in block 7 of a certain addition. By mistake, he went onto lot 5 in block 10 of the same addition, which belonged to the Peoples Savings Bank, and slashed and cleared that lot, fenced three sides of it, and planted turnips thereon. This dated back to 1903, and in 1907 he built a house on the lot. The addition was in an outlying district, ungraded, unimproved, and but sparsely settled, and the Peoples Savings Bank did not know that Bufford was on its property until the tax statement in 1913 showed a tax on improvements, which led to

an investigation and the discovery of his occupancy. We are not here dealing with outlying, unimproved, and sparsely settled property, or with a house built within the statutory period.

Despite the language in the opinion, which indicated that the court did not believe that Bufford had established his defense of adverse possession, the property was actually awarded to him, subject to an election by the Peoples Savings Bank either to take a deed to the unimproved lot 5 in block 7, to which Bufford had title and on which he had thought his house and other improvements were located, or to receive from him the taxes they had paid on lot 5, block 10, subsequent to his occupancy thereof.

While the erection or existence of a fence is an important evidentiary fact to be weighed with the other evidence in the case, it is not a condition precedent to a claim of adverse possession. Only a portion of the lot was fenced in *Thornely v. Andrews, supra.* As Mr. Justice Story said in *Ellicott v. Pearl,* 35 U. S. 271 (10 Peters 412), 9 L. Ed. 475:

"To constitute actual possession, it is not necessary, that there should be any fence or enclosure of the land. If authority were necessary, for so plain a proposition, it will be found in the case of *Moss v. Scott,* 2 Dana (Ky.) 275, where the court say, that 'It is well settled, that there may be a possession in fact, of land not actually enclosed by the possessor.' "

See, also, *Whalen v. Smith,* 183 Iowa 949, 167 N. W. 646, where it is said:

"To constitute adverse possession, or to set in operation the statute of limitations, does not necessarily require the claimant to live upon the land, or to enclose it with fences, or to stand guard at all times upon its borders, to oppose the entry of trespassers or hostile claimants. It is enough if the person pleading the statute takes and maintains such possession and exercises such open dominion as ordinarily marks the conduct of owners in general, in holding, managing, and caring for property of like nature and condition."

And *Heinrichs v. Polking,* 185 Ky. 433, 215 S. W. 179, where it is said:

"Neither do we think, that because Polking nor his devisee ever enclosed all of the disputed land with a fence, appellees fail in the evidence of an adverse possession, although some language of several opinions of this court, rendered in former times, would seem to indicate an adherence to that doctrine, when adverse possession is claimed by one adjoining proprietor as against another. . . . In a case like the instant one, there is no reason to require an inclosure of the land, in dispute, to maintain an adverse possession. *If the land is claimed and held to a well defined boundary, openly, notoriously, adversely, and continuously for the statutory period, it is sufficient. The boundary must be well defined.* As said in *Abbot v. Perkinson*, 144 Ky. 499, which was a contest between adjoining proprietors: 'To illustrate, if land is cultivated under a claim of right for fifteen years or more to a boundary well marked by cultivation, the adverse holding will extend to the limits of the ground so cultivated as effectually as it would to a fence.'" (Italics ours.)

██ With due regard to the weight to be accorded the trial court's findings in a case of this character, we are satisfied that the Thorsks, Duenwalds, and Seymours did, by actual and uninterrupted, open and notorious, hostile and exclusive possession under a claim of right made in good faith for more than ten years, establish their right by adverse possession to all of the 3½-foot strip involved in this case, except where the stone wall built by Mr. Smart may project a trifle onto that strip.

The judgment quieting title in the respondents to the 3½-foot strip in question is reversed, with instructions to enter a decree quieting title thereto in the appellants; but such decree should be so framed as to protect the respondents in their right to have the stone wall undisturbed.

MALLERY, C. J., MILLARD, SIMPSON, and SCHWELLENBACH, JJ., concur.