275 P.3d 1231 (2012)
James R. HERRIN, a single man, and Rebecca Herrin, as her separate property, Appellants,
v.
Ellen O'HERN, a single woman, Respondent.
No. 66195-7-I.
Court of Appeals of Washington, Division 1.
May 14, 2012.
*1232 Robert Michael Tull, Langabeer & Tull PS, Bellingham, WA, for Respondent.
Patrick Michael Hayden, Attorney at Law, Sedro Woolley, WA, for Appellants.
COX, J.
¶ 1 A party who originally uses property with the permission of its owner and who later claims ownership by adverse possession has the burden of proving that the owner terminated permissive use of the property.[1] The relevant viewpoint for determining whether and when permissive use terminates is that of the owner who granted permission.[2]
¶ 2 Here, James Herrin and Rebecca Herrin claim adverse possession to property whose record title owner is Ellen O'Hern. There is a genuine issue of material fact whether the former owners of the property revoked permissive use of it by a December 1993 deed to James Herrin and others. If so, the hostility element of adverse possession arguably commenced at the time of that deed. Thus, hostile use of the property, one of the necessary elements of adverse possession, arguably began more than 10 years *1233 before the commencement of this action. We reverse and remand for further proceedings.
¶ 3 Howard and Janet Rothenbuhler formerly owned the two adjoining parcels of property in Acme that are involved in this case.[3] The Herrins now own the southwest parcel, on which a farmhouse sits. O'Hern owns the northeast parcel, consisting of a field, barn, and acreage, which borders the southwest parcel on its northern and eastern sides.
¶ 4 James Herrin married Julia Reed, the Rothenbuhlers's daughter, but the marriage ended. In 1988, the Rothenbuhlers allowed Herrin to move into the farmhouse, and he became the caretaker of both the northeast and southwest parcels. By a deed of gift dated December 14, 1993, the Rothenbuhlers conveyed the farmhouse to Herrin and his two children. James Herrin and Rebecca Herrin, father and daughter, now own this property.
¶ 5 Ellen O'Hern acquired the northeastern parcel, which formerly belonged to her parents, the Rothenbuhlers, by deed from her father's estate in December 2003, following his death in June 2001.
¶ 6 O'Hern holds record title to the property. It is on the southwest portion of her property and consists of a garage, surrounding land, and additional land within a fence. The record shows this property has always been used by the owners of the farmhouse property now owned by the Herrins.
¶ 7 In 2008 or 2009, a survey disclosed that the property now in dispute encroached on the northeastern parcel. Nothing in this record shows that anyone was aware of the encroachment before the survey.
¶ 8 In May 2009, the Herrins commenced this action to quiet title to the disputed property. They claimed that they acquired title by adverse possession. They also advanced other theories that are not relevant to this appeal. O'Hern counterclaimed to quiet title, to terminate use, and to eject the Herrins.
¶ 9 O'Hern moved for summary judgment. For purposes of that motion only, she conceded that the adverse possession elements of actual, open, continuous, and exclusive use existed. But she contended that the hostility element was not met because the Herrins's use was permissive. She argued that permissive use of the disputed property commenced in 1988, when Herrin took on his duties as caretaker of both the northeast and southwest parcels. Relying on Miller v. Anderson,[4] she argued further that such permissive use did not terminate until her father's death in 2001. Thus, according to her, less than 10 years elapsed between that date and this action. The trial court granted O'Hern's motion and denied the Herrins's motion for reconsideration.
¶ 10 The Herrins appeal.

PERMISSIVE USE AND HOSTILITY
¶ 11 The Herrins argue that there is a genuine issue of material fact whether permissive use of the disputed property terminated in December 1993. If so, hostile use of the property began at that time, commencing the 10-year period required to establish adverse possession. We hold that there is a genuine issue of material fact whether the former owner of the disputed property revoked permissive use in December 1993.
¶ 12 In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact.[5] If the moving party is a defendant and meets this initial showing then the inquiry shifts to the party with the burden of proof at trial, the plaintiff.[6] If the plaintiff fails to show the existence of an element essential to his case, and on which he will bear the burden of proof at trial, then summary judgment is proper.[7] In effect, there can be no genuine issue as to any material fact because *1234 failure to prove an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[8] In responding to the summary judgment motion, the plaintiff cannot rely on the allegations made in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial by affidavits or as otherwise provided by Civil Rule 56(e).[9]
¶ 13 This court reviews de novo a summary judgment order, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[10]
¶ 14 As this court stated in Miller, the adverse possession doctrine arose in order to assure the maximum utilization of the land, encourage the rejection of stale claims, and quiet titles.[11] But courts will not permit the "theft" of property by adverse possession unless the owner had notice and an opportunity to assert his or her right.[12] Therefore, there is no presumption in favor of the adverse holder because possession is presumed to be subordinate to the true owner's title.[13]
¶ 15 Adverse possession requires 10 years of possession that is (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile.[14] "The `hostility/claim of right' element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period."[15] Hostility is not personal animosity or adversarial intent, but instead connotes that the claimant's use has been hostile to the title owner's, in that the claimant's use has been akin to that of an owner.[16]
¶ 16 Permission to occupy the land, as given by the true title owner to the claimant, will negate the hostility element.[17] This means that use of the land with the true title owner's permission cannot be hostile.[18] Therefore, "`a different set of rules applies when the initial use is permissive.'"[19] The party claiming adverse possession bears the burden of proving that permission terminated.[20] "Because permission is personal to the grantor and cannot extend beyond that person's ownership, the relevant viewpoint for determining when permissive use terminates is that of the party granting the permission."[21]
¶ 17 Adverse possession is a mixed question of law and fact.[22] Whether the essential facts exist is for the trier of fact, but whether the facts constitute adverse possession is for the court to determine as a matter of law.[23]
¶ 18 Here, it is undisputed that the Herrins's use of the disputed property was permissive at its inception when Herrin worked as its caretaker. And it is also true that permissive use may terminate when the servient *1235 estate has changed hands through death or alienation.[24] But these principles do not end our inquiry. The proper inquiry, as this court stated in Miller, is whether any act after the grant of permission terminated permissive use such that hostile use arose.[25]
¶ 19 There is a presumption that the Herrins's use of the disputed property continued with the Rothenbuhlers's permission, especially given their friendly and familial relationship.[26] On summary judgment, the Herrins had the burden to show that there was a genuine issue of material fact rebutting that presumption. Viewing the evidence in their favor, as we must, they did so.
¶ 20 In his declaration opposing summary judgment, James Herrin testified that the garage on the disputed property was always used exclusively by the owner of the farmhouse property. The garage is only accessible from the farmhouse's driveway, and the single garage door faces the farmhouse and driveway. He further testified that he has used that garage and driveway for storage and parking since he acquired ownership in 1993.
¶ 21 He also testified that the fences that the survey shows encroach on O'Hern's parcel are attached to the garage. They bar access to the garage from O'Hern's parcel to the northeast. And he testified to his activities inside that fence and around the garage.
¶ 22 The Herrins also submitted two additional declarations in opposition to the motion, one from Reed and one from Neal Rothenbuhler, the Rothenbuhlers's son.[27] Neal's declaration states:
... I can say with certainty that until the location the legal description for James Herrin's property was revealed by a survey which I obtained in 2008-09, no one knew that the garage and fences surrounding the property were outside his legal description. I have never heard this issue raised by anyone prior to obtaining the surveyneither by James Herrin, my father Howard Rothenbuhler, nor my sister Ellen O'Hern.
It was generally accepted by all parties that the garage was owned by whomever owned the house, and that the fences were the property boundaries for James Herrin's property....
....
... The fact is that no one knew the location of the garage and fence lines until the survey was completed, and prior to the survey, everyone presumed that they belonged to the owner of the house, currently James Herrin.[28]
Reed's declaration makes similar statements:
... At no time prior to a 2008-09 survey, to my knowledge did anyone question that the land inside the fence lines around the house, and the garage, belonged to the owner of the house.... The general understanding of everyone, including my father if he even thought about it, was that the land inside the fence, and particularly the garage, belonged to the owner of the house, who is now James Herrin. It was not an issueit was just commonly understood.
....
... [O'Hern's] argument that our father and she (apparently alone) knew the garage was on other property but out of affection remained silent and let James Herrin use it with implied consent, is simply not true based on my personal knowledge and experience. (If my father knew the garage was not on James Herrin's property he would probably have given it to him by deed, and if Ellen knew, she would have documented the fact that his use was with her permission.).[[29]]
¶ 23 It is undisputed that the Rothenbuhlers conveyed the house to James Herrin and others by a deed of gift dated December 1993. It is also undisputed that the legal description in this deed describes the farmhouse *1236 property that the Herrins own. But the deed does not include the contiguous disputed property that evidence shows was always used with the farmhouse.
¶ 24 Whether the December 1993 conveyance terminated permissive use of the farmhouse property is undisputed. It did, by operation of law. That is because permissive use cannot extend beyond ownership.[30]
¶ 25 The question for trial is whether this conveyance also terminated permissive use of the adjoining disputed property, which was always used in connection with the farmhouse property described in the deed. As we stated earlier in this opinion, the relevant viewpoint for making this determination is the owner who gave permission in the first instance. In this case, there is no evidence to show that the Rothenbuhlers distinguished between the farmhouse property and the disputed property on which the garage is located. To the contrary, the evidence is that no one knew that the record title line divided them. Thus, the finder of fact could conclude, on the basis of the December 2003 deed as well as other evidence that may be developed for trial, that the Rothenbuhlers also revoked permissive use of the disputed property in December 1993. This would have begun the hostile use necessary to establish adverse possession.
¶ 26 O'Hern argues that the Herrins presented no evidence that permissive use of the disputed property was terminated. To the contrary, we just discussed how the evidence does just that.
¶ 27 Next, O'Hern argues that Reed's and Neal's declarations only indicate that they were "unaware of any discussions ever, by anyone, regarding the use of the disputed property." Therefore, "they present no evidence that the permissive use was ever revoked." This is a reasonable interpretation of the declarations. But taking them in the light most favorable to the Herrins, they indicate that the Rothenbuhlers revoked permissive use of both the property described in the deed as well as the disputed property. Therefore, O'Hern's characterization of the declarations does not support the grant of summary judgment.
¶ 28 O'Hern argues that under Miller, revocation of permissive use could only occur on the sale of the servient estate, with clear notice of revocation, or with an obvious change in use that terminates the permission. She argues that the Herrins have not produced evidence of any of these events. She is mistaken.
¶ 29 In Miller, landowner Shaw gave implied or express permission to his neighbor Turtle to leave a fence on his property.[31] Tuttle sold the lot to Clark five years later.[32] Clark, in turn, sold it to Miller.[33] Shaw sold his lot 13 years later to Anderson.[34] A survey performed during Miller and Anderson's ownerships revealed the true property line.[35] The trial court quieted title in Miller based on adverse possession.[36] It concluded that Turtle's use was permissive, but that the permission was revoked as a matter of law by Tuttle's sale to Clark.[37]
¶ 30 On appeal, Miller argued that Tuttle's sale to Clark ended the permissive use because permission is a revocable, personal, non-assignable license that terminates upon the sale of either estate.[38] The court reasoned that a landowner who gives permission to another to use his land should not be required to "monitor any and all transfers of his neighbor's estate to insure that his permission is not extinguished."[39] The court reversed, holding that "absent revocation, only the sale of the servient estate, clear *1237 notice, or obvious change in use terminates permission."[40]
¶ 31 In contrast to Miller, here there is a genuine issue of material fact whether the Rothenbuhlers revoked permissive use of the disputed property when they conveyed the adjoining property by deed in December 1993. This conveyance occurred when no one distinguished between the farmhouse property described in the deed and the contiguous disputed property where the garage used with the farmhouse was located. If revocation occurred then, the hostility element of adverse possession commenced at that time and it is immaterial when the servient estate was conveyed. As stated in Miller, such factors are only considered in the absence of revocation of permission.[41]
¶ 32 Moreover, the question of notice to the owner revoking permissive use is not the same in this case as in Miller. The Rothenbuhlers had actual notice of the conveyance to the Herrins of the property in the deed. Because there is no evidence that they treated the disputed property differently from the property described in the deed, they also had notice of the beginning of hostile use. For these reasons, Miller is not dispositive.
¶ 33 Finally, O'Hern argues that the Herrins are attempting to shift the burden of proof to the servient estate owner to prove that permissive use has not been revoked. Specifically, she claims that the Herrins argue that, by his gift, Howard is presumed to know that the Herrins claimed ownership of the disputed property by adverse possession. This mischaracterizes the Herrins's argument.
¶ 34 The Herrins argue that there is a genuine issue of material fact whether the Rothenbuhlers revoked permissive use of the disputed property when conveying the farmhouse property in December 1993. This argument does not require any shifting of the well-established burden of proof from the party claiming adverse possession to the servient estate owner.

DEADMAN'S STATUTE
¶ 35 The Herrins argue that O'Hern's testimony that Howard Rothenbuhler implicitly consented to the use of the garage and fenced yard violates the Deadman's Statute, RCW 5.60.030. For the following reasons, it is unnecessary for us to resolve this issue in this appeal and we decline to do so.
¶ 36 The Herrins made a similar point in their briefing below. But they did not move to strike any portions of O'Hern's declaration. O'Hern did not substantively address the argument below, and the trial court made no ruling in its summary judgment order. In short, there is no ruling on this issue for this court to review.
¶ 37 We also note that our analysis is based on evidence submitted by others: James Herrin, Neal Rothenbuhler, and Julia Reed. Thus, there is no reason for this court to address the admissibility of O'Hern's testimony in this appeal.
¶ 38 Accordingly, we do not decide whether or to what extent testimony by O'Hern or others may be barred by the Deadman's Statute.

STATUTORY ATTORNEY FEES
¶ 39 Both sides seek statutory attorney fees based on Rule of Appellate Procedure 18 and RCW 4.84.080. The Herrins are entitled to the statutory award for prevailing in this appeal.
¶ 40 We reverse and remand for further proceedings.
WE CONCUR: SPEARMAN, A.C.J., and ELLINGTON, J.
NOTES
[1] Miller v. Anderson, 91 Wash.App. 822, 829, 964 P.2d 365 (1998).
[2] Id.
[3] For clarity, this opinion refers to Howard and Janet Rothenbuhler by their first names.
[4] 91 Wash.App. 822, 827, 964 P.2d 365 (1998).
[5] Young v. Key Pharm., Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989).
[6] Id.
[7] Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
[8] Id. (quoting Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548).
[9] Id. at 225-26, 770 P.2d 182.
[10] Schaaf v. Highfield, 127 Wash.2d 17, 21, 896 P.2d 665 (1995).
[11] Miller, 91 Wash.App. at 827, 964 P.2d 365 (quoting Roy v. Cunningham, 46 Wash.App. 409, 412, 731 P.2d 526 (1986)).
[12] Id.
[13] Id. (quoting Muench v. Oxley, 90 Wash.2d 637, 642, 584 P.2d 939 (1978), overruled on other grounds by Chaplin v. Sanders, 100 Wash.2d 853, 861 n. 2, 676 P.2d 431 (1984)).
[14] Id. at 827, 964 P.2d 365.
[15] Chaplin, 100 Wash.2d at 860-61, 676 P.2d 431.
[16] Id. at 857-58, 676 P.2d 431; Malnati v. Ramstead, 50 Wash.2d 105, 108, 309 P.2d 754 (1957).
[17] Miller, 91 Wash.App. at 828, 964 P.2d 365 (citing Chaplin, 100 Wash.2d at 861-62, 676 P.2d 431).
[18] Id.
[19] Id. (quoting Granston v. Callahan, 52 Wash. App. 288, 293, 759 P.2d 462 (1988)).
[20] Id. at 829, 964 P.2d 365.
[21] Id.
[22] Peeples v. Port of Bellingham, 93 Wash.2d 766, 771, 613 P.2d 1128 (1980), overruled on other grounds by Chaplin, 100 Wash.2d 853, 676 P.2d 431.
[23] Anderson v. Hudak, 80 Wash.App. 398, 401-02, 907 P.2d 305 (1995) (citing Peeples, 93 Wash.2d at 771, 613 P.2d 1128).
[24] Miller, 91 Wash.App. at 829, 964 P.2d 365.
[25] Id.
[26] Granston, 52 Wash.App. at 294, 759 P.2d 462.
[27] For clarity, this opinion refers to Neal Rothenbuhler by his first name.
[28] Clerk's Papers at 92-93.
[29] Id. at 94-95.
[30] Miller, 91 Wash.App. at 829, 964 P.2d 365.
[31] Miller, 91 Wash.App. at 824, 964 P.2d 365.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Id.
[37] Id.
[38] Id. at 829, 964 P.2d 365.
[39] Id. at 830, 964 P.2d 365.
[40] Id. at 832, 964 P.2d 365 (emphasis added).
[41] Id.