IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

JOHN W. LEBLEU and ROLA M.   )
LEBLEU, husband and wife,   )   No. 32908-9-III
  )
    Respondents,   )
  )
   v.   )
  )   PUBLISHED OPINION
DAVID W. AALGAARD and LOUELLA   )
A. AALGAARD, husband and wife,   )
  )
    Appellants.   )

SIDDOWAY, C.J. — In determining whether a person has acquired title to real property through adverse possession, the fact that he or she was given permission to occupy land by the true title owner will operate to negate the essential element of hostility. But in the case of a failed parol agreement to adjust a boundary line, the fact that the true title owner agreed that his neighbor would *own* whatever land fell on the neighbor's side of the agreed line does not negative the element of hostility. As some authorities have put it, parties can agree to a nonowner's use of land that is adverse.

Accordingly, while an oral agreement that David Aalgaard reached with the Aalgaards' former neighbor as to their shared property line is not enforceable, the existence of that agreement does not detract from the Aalgaards' evidence that following the 1993 agreement, they adversely possessed an area on which they built a home and

outbuildings and lived for 20 years. Because the undisputed evidence demonstrates that the Aalgaards have satisfied the elements of adverse possession to at least some of the property held of record by John and Rola LeBleu, we reverse the trial court's order granting summary judgment to the LeBleus and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

In September 1991, Eric and Kim Deno purchased approximately 20 acres of property in Chattaroy. At that time, their seller—who had retained property to the north—walked the property with Mr. Deno and showed him the location of the property's boundary lines.

In June 1993, the same seller sold his remaining parcel north of the Deno property (also approximately 20 acres) to Dave and Louella Aalgaard. Shortly thereafter, Mr. Deno and Mr. Aalgaard walked and measured their respective properties and established a boundary line that Mr. Deno described as

> a straight line defined by our agreement as to the location and physical
> monuments and features between our respective parcels. The line ran from
> a 90° corner then down along the center of a natural gully dividing our
> parcels.

Clerk's Papers (CP) at 341. Mr. Deno describes their agreement on the boundary line as "important," because he planned to assist the Aalgaards in building the home on their property. *Id.*

2

Following the men's agreement on the property line, the Aalgaards began building their home "at least 50 feet, if not more from the common boundary line" they had established. *Id.* The foundation of the Aalgaards' home was placed with Mr. Deno's assistance. With the help of Mr. Deno, the Aalgaards finished building their home in 1994. They later installed a water line, a propane tank, a barn, a woodshed, and a shop on the property, "approximately 30 feet from the agreed boundary line." CP at 308.

In 2012, John and Rola LeBleu bought the property formerly owned by the Denos. In November 2013, Bruce Larsen of Landtek LLC was engaged to perform a survey and discovered that the Aalgaards' home, barn, and shed were located on the LeBleus' property. In preparing his survey map, he drew "clearing limits," which he describes as "the area that is out of the woods and appeared to be used by the Aalgaards." CP at 211. He measured the area as containing approximately 0.61 acres.

The LeBleus brought suit against the Aalgaards a month later, seeking possession of all the property to which the LeBleus held record title and an injunction requiring the Aalgaards to remove their improvements. The Aalgaards counterclaimed, asking that the court quiet title to the disputed property in them based on multiple theories, including parol agreement, acquiescence, and adverse possession.

Both sides moved for summary judgment, which the trial court granted in the LeBleus' favor. In ruling on the adverse possession claim, the court reasoned that the hostility element could not be shown because the Aalgaards used the property with Mr.

3

Deno's permission. The court quieted title in the LeBleus, ejected the Aalgaards, and ordered them to remove their house, barn, and shed from the property within 30 days.

Upon the Aalgaards' filing of a notice of appeal, the court stayed its order of ejectment.

## ANALYSIS

To establish a claim of adverse possession, a party's possession of property must be: (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile and under a claim of right. *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984). All of these elements must exist concurrently for at least 10 years. RCW 4.16.020. Because courts presume that the holder of legal title is in possession, "the party claiming to have adversely possessed the property has the burden of establishing the existence of each element." *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989).

The only element of adverse possession that the LeBleus claim is not established by the Aalgaards is that of hostility. Hostility "'does not import enmity or ill-will.'" *Chaplin*, at 857 (quoting *King v. Bassindale*, 127 Wash. 189, 192, 220 P. 777 (1923)).

> The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.

*Id.* at 860-61.

The Aalgaards treated the property as their own; they constructed a home and other significant improvements. "The construction and maintenance of a structure partially on the land of another almost necessarily is exclusive, actual and uninterrupted, open and notorious, hostile and made under a claim of right." *Draszt v. Naccarato*, 146 Wn. App. 536, 542, 192 P.3d 921, (2008) (citing *Reitz v. Knight*, 62 Wn. App. 575, 582, 814 P.2d 1212 (1991)). Professor Stoebuck has suggested that the most useful general test of hostility is whether "[c]onsidering the character of possession and the locale of the land, is the possession of such a nature as would normally be objectionable to owners of such land?" 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.12, at 526 (2d ed. 2004) (citing *People's Sav. Bank v. Bufford*, 90 Wash. 204, 155 P. 1068 (1916)). Normally, constructing a home, outbuildings, and infrastructure on a neighbor's residential parcel would be highly objectionable.

In the trial court, the LeBleus successfully invoked the presence in this case of "permission." But permission to do what? Mr. Aalgaard and Mr. Deno indisputably reached an agreement in 1993. But before equating an agreement with permissive use that will negate the element of hostility, one must consider the agreement.

Washington cases hold that permissive use of the sort that will negative hostility and prevent adverse possession is use based on a personal, revocable license from the true title owner. *E.g., Miller v. Anderson*, 91 Wn. App. 822, 829, 964 P.2d 365 (1998);

5

*Teel v. Stading*, 155 Wn. App. 390, 395, 228 P.3d 1293 (2010); *Granston v. Callahan*, 52 Wn. App. 288, 294, 759 P.2d 462 (1988) (citing BLACK'S LAW DICTIONARY 1298 (rev. 4th ed. 1968)). If there is no explicit agreement but only unobjected-to use, it is reasonable to infer a personal revocable license. But where there is an explicit agreement, it can be agreement to something that is different from "permission" in this sense. It can be agreement to adverse use, such as an agreement to a permanent boundary line.[1]

A leading treatise explains:

> [I]t appears reasonably safe to say that a use is adverse if not accompanied by any recognition, in express terms or by implication, of a right in the landowner to stop such user now or at some time in the future. The recognition of the landowner's right to put an end to the user precludes any presumption, from his failure to assert such right, that no such right exists.
>
> . . . .
>
> When the owner undertakes to confer upon another a perpetual right of user in the land, but fails to do so in a valid manner, as when he makes an oral grant of an easement, the user of the land by such other in accordance with the terms of the invalid grant cannot be regarded as permissive and in subordination to the rights of the landowner, but is in effect adverse to such rights. Such a case is analogous to that of the possession of land under an invalid conveyance thereof, which is ordinarily adverse to the grantor. The user of the land under such circumstances involves no recognition of any right as remaining in the grantor.

---

[1] We need not address a disagreement over whether the Aalgaards have changed their position on appeal as to whether Mr. Aalgaard and Mr. Deno were attempting in 1993 to find the actual property line, or were simply settling on an agreed line. It does not matter to our analysis.

4 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 1196 (3d ed. 1975) (footnotes omitted).

Washington cases dealing with prescriptive easements are in accord. In *Lechman v. Mills*, 46 Wash. 624, 91 P. 11 (1907), the evidence showed that a predecessor owner of land had verbally granted an easement for a water ditch across his land. The purported grantee constructed the ditch and then used it in an exclusive, open, notorious and hostile manner for a period sufficient to acquire a prescriptive right. In rejecting the title holder's argument that use of the ditch had been permissive, the court observed that evidence supported the trial court's finding that the agreement made "was not a mere revocable license or permission to occupy, but that it was intended to operate as a grant." *Id.* at 628. Such an agreement could not be equated with permissive use:

> [T]he use was not deprived of its adverse character or rendered merely permissive for the purposes of the statute of limitations, by a showing that it was preceded by an oral agreement amounting in terms to a grant but void under the statute of limitations.
> "It is generally agreed that use of an easement under claim of right by virtue of a parol grant, may be adverse so as to give it title by prescription, although the parol grant itself is void under the statute of frauds." 22 Am. & Eng. Ency. Law (2d ed. [1902]), p. 1198, and cases cited.

*Id.* at 629.

A Washington adverse possession case also illustrates the difference between agreement to a permissive use and agreement to an adverse use. In *Beck v. Loveland*, 37 Wn.2d 249, 222 P.2d 1066 (1950), *overruled on other grounds by Chaplin*, 100 Wn.2d at

7

861 n.2, neighboring landowners, not wanting to incur the cost of a survey, agreed on a tentative fence line but with the understanding that it was subject to correction by a survey. The tentative nature of the agreement was decisive in the court's analysis:

> [The grantor, Chapman] never varied from his testimony to the effect that he and his grantee, Powell, never intended that either one of them would claim any land beyond the north and south center line of the quarter section, and that the line of the north and south fence which the parties erected was only tentatively agreed upon as the boundary line between their properties and was always subject to correction if a survey demonstrated that the fence was not along the true line referred to in the deed.

*Id.* at 254. Inasmuch as the mutual permission given was only to occupy and use any land that fell on the other party's side of the fence until a survey established the true line, the occupation and use of unowned land was not hostile. When a survey later revealed that the fence encroached on the land of a successor to one of the parties, he was entitled to take it down. The court explained that the result would have been different had the nature of the agreement been different:

> In order to prevail in the case at bar, it would be necessary for appellants, who acquired title to their property in 1947, to show that Powell, their predecessor in interest, had maintained possession, at least for a considerable period, of the strip in question *while claiming to own it.* This claim is clearly not supported by the testimony, including that of witnesses called by appellants.

*Id.* at 259 (emphasis added).

Here, the declarations of Mr. Aalgaard and Mr. Deno do not reveal an agreement that was tentative and subject to correction by any future survey. Their declarations state

that they were "establish[ing,]" "agree[ing,]" and "defin[ing]" their common boundary line. CP at 307, 272. In support of their alternative theory of parol agreement, the Aalgaards argued to the trial court that they and the Denos were uncertain as to the true boundary line between their properties, and therefore made a "permanent agreement, clearly specifying where the boundary line was located." CP at 335. Even the court observed that the 1993 agreement was more like the foundation of a parol agreement or acquiescence claim (although those theories failed because the Aalgaards could not prove a clearly marked boundary) because in a "classic adverse possession case," you wouldn't have "two parties go out and say, by golly, this is the line." Verbatim Report of Proceedings (VRP) at 28.

The failure of the parol agreement did not prevent the Aalgaards from acquiring title by adverse possession to the extent that, for at least 10 years following the oral agreement, they possessed land on their side of the agreed line exclusively, actually and uninterruptedly, openly and notoriously, hostilely and under a claim of right. *Chaplin*, 100 Wn.2d at 857. Mr. Deno's agreement that the Aalgaards would own whatever fell on their side of the agreed property line does not negative the element of hostility— arguably, it strengthens the adverse possession claim. A similar example is offered by Professor Stoebuck:

> Suppose one neighbor says to the other, "I think my fence, and part of my rockery, shrubbery, and lawn may be over a few feet onto your side," and the other replies, "Okay." Did one seek, and the other grant, permission?

9

> If "okay" meant only, "I know you are an adverse possessor," that should, if anything, strengthen the adverse possession by insuring that it was "notorious."

17 STOEBUCK ET AL., *supra*, § 8.12, at 527. *Cf. Robert v. Perron*, 269 Mass. 537, 169 N.E. 489, 490 (1930) (possession pursuant to an understanding that recognizes no further right in the owner and amounts to an assurance that owner will not interfere with possession now or ever, is, for adverse possession purposes, adverse, not permissive); ·accord *Calkins v. Kousouros*, 72 Idaho 150, 237 P.2d 1053 (1951) (citing *Robert*, 269 Mass. 537).

The lawyer for the LeBleus nonetheless urged us at oral argument that our view cannot be reconciled with *Granston*, *Miller* and *Teel*. We disagree.

*Granston* involved two brothers who knowingly constructed a barn, corral, driveway and walks on each other's waterfront properties, and were found to have done so permissively. Because a permissive use ends when the licensor dies (here, the brothers had passed), the appellate court concluded that rights their children claimed by adverse possession in large part failed. Moreover, the court held that because the use had been permissive, testing hostility by whether the permitted user treats the property as his own (e.g., by building a structure) is not helpful. 52 Wn. App. at 293. "[A] different set of rules applies when the initial use is permissive." *Id.*

The critical first step, then, is to determine whether the initial use *is* permissive. In *Granston*, the court noted that a finding of permissive use is supported by evidence of a

10

close, friendly relationship or family relationship and found it significant that the

brothers'

> affection for each other and completely open, cooperative, and trusting
> lifestyles were completely consistent with an implied permission by each to
> the other to use his property and the improvements freely.

*Id.* at 295. The court held that the facts before it demonstrated "a clear, almost

indisputable, case of permissive use." *Id.*

Here, by contrast, Mr. Deno and Mr. Aalgaard had no preexisting relationship or

family relationship. By the LeBleus' admission, the position of the two men was that

"they did not know where [the boundary line] was so they made a permanent agreement,

clearly specifying where the boundary line was located, which resolved the uncertainty."

Br. of Resp't at 12.

*Miller* and *Teel* also involve use of an owner's property that was established to be

permissive at its inception but that neighbors claimed became adverse thereafter—in

*Miller,* through a change in title, and in *Teel*, through a distinct change in use. Because

the LeBleus have treated "agreement" in this case as synonymous in every case with

"permissive use," they assume that some distinct, post-1993 notice by the Aalgaards of

adverse use was required but is lacking.

For reasons stated, we reject the premise that Mr. Aalgaard's and Mr. Deno's

initial agreement was that each family would have permissive use of the land on its side

of the agreed line. The undisputed evidence is of an agreement that each family would

11

own the land on their side of the agreed line—perpetual, exclusive use, necessarily adverse. Because the agreement in this case was for mutually adverse use at its inception, no notice of a distinct change in use was required.

There remains the issue of the proper boundary line between the parties' property based on the Aalgaards' adverse possession. Mr. Larsen's depiction of "clearing limits" in his survey is one piece of evidence. But the trial court correctly recognized that the boundary line established by adverse use remains a question of fact, to be determined based on the use and occupancy of the character that a true owner would assert in view of the property's nature and location. VRP at 24-25; *Chaplin*, 100 Wn.2d at 861-63.

We reverse and remand for proceedings consistent with this opinion.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

12

No. 32908-9-III

FEARING, J. (concurring) — I concur in the ruling and the rationale behind the ruling of the majority. I write separately to encourage the state legislature or state high court to renovate and simplify Washington's doctrine of adverse possession. Adverse possession suffers from archaic and confusing terms. Through the years, the doctrine has garnered a proliferation of inconsistent and overlapping elements.

As illustrated by this appeal, few legal doctrines cause more confusion than the doctrine of adverse possession. This confusion arises from a dogmatic attachment to a four-part test by Washington courts. The four-part test employs antiquated and muddled words and phrases.

Under Washington case law, the adverse possession doctrine generally encompasses four elements: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012). The four-part test results from the compulsion of scholars and judges to make lists of elements and to unnecessarily organize the law. Excessive organization leads to disorder, since human activity does not lend itself to compartmentalization.

Note that at least two of the elements, (1) open and notorious and (2) actual and

uninterrupted, have two components with the result that the doctrine actually comprises six factors. When one adds the requirement of ten years, the doctrine adopts a seventh element. One Washington decision outlines the doctrine of adverse possession with five elements: a party must show that her possession of the claimed property was (1) for ten years, (2) exclusive, (3) actual and uninterrupted, (4) open and notorious, and (5) hostile. *Harris v. Urell*, 133 Wn. App. 130, 136, 135 P.3d 530 (2006).

Although not critical, the order of the elements changes from decision to decision. Courts variously restate the test as: the claimant must show possession that has lasted for ten years and that is (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile. *Acord v. Pettit*, 174 Wn. App. 95, 103, 302 P.3d 1265 (2013). To prove adverse possession, the claimant must prove that he possessed the disputed area in a manner that was (1) exclusive, (2) open and notorious, (3) hostile, and (4) actual and uninterrupted for the statutory period of ten years. *Teel v. Stading*, 155 Wn. App. 390, 393-94, 228 P.3d 1293 (2010). The adverse possession doctrine generally encompasses four elements: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. *Gorman v. City of Woodinville*, 175 Wn.2d at 71 (2012).

Other restatements of adverse possession by Washington courts include: the claimant must show use that was open, notorious, continuous, uninterrupted, and adverse to the property owner for the prescriptive period of ten years. *Cole v. Laverty*, 112 Wn. App. 180, 184, 49 P.3d 924 (2002). This statement of the law separates all elements and adds the constituents "continuous" and "adverse." The decision does not explain if

2

"continuous" means something other than "uninterrupted."

The doctrine of adverse possession formerly required that the claimant take possession in "good faith" and not recognize another's superior interest. *Dunbar v. Heinrich*, 95 Wn.2d 20, 23, 622 P.2d 812 (1980); *Wickert v. Thompson*, 28 Wn. App. 516, 518, 624 P.2d 747 (1981), *overruled by Chaplin v. Sanders*, 100 Wn.2d 853, 676 P.2d 431 (1984). In *Chaplin v. Sanders*, 100 Wn.2d 853, 860-62, 676 P.2d 431 (1984), the Evergreen State high court discarded the element of good faith. Now the claimant's subjective belief regarding his or her true interest in the land and his or her intent to dispossess or not dispossess another is irrelevant to the determination of adverse possession.

In *Shelton v. Strickland*, 106 Wn. App. 45, 50, 21 P.3d 1179 (2001), this court listed an added element of "claim of right" when declaring: to establish ownership of a piece of property through adverse possession, a claimant must prove that his or her possession of the property was: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, (4) hostile and under a claim of right, (5) for a period of ten years. Despite this exposition of the law, the Supreme Court likely eliminated the element "claim of right" in *Chaplin v. Sanders*, 100 Wn.2d at 857, when the court jettisoned good faith as an element. This court, in *Lilly v. Lynch*, 88 Wn. App. 306, 312, 945 P.2d 727 (1997), proclaimed that "a claim of right made in good faith" remains an element of adverse possession and cites *Chaplin v. Sanders* for this proposition despite the Supreme Court decision overruling good faith as an element thirteen years previous.

3

Words used to enunciate adverse possession's four elements do not carry their contemporary, ordinary meanings. "Notorious" erroneously suggests that only Al Capone or James Traficant can take property by adverse possession. Nevertheless, "notorious possession," as applied to the adverse holding of land, only means that the claimant's claim of ownership is evidenced by such acts and conduct sufficient to put a man of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own. *Skoog v. Seymour*, 29 Wn.2d 355, 362, 187 P.2d 304 (1947), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853 (1984). "Hostile" improvidently suggests that only Attila the Hun or Muammar Gaddafi can claim adverse possession. Yet, hostility is not personal animosity or adversarial intent. *Herrin v. O'Hern*, 168 Wn. App. 305, 310-11, 275 P.3d 1231 (2012). "Exclusive" does not mean "exclusive" in adverse possession jurisprudence but only exclusive to the extent one would expect of a titled property owner under the circumstances. *Harris v. Urell*, 133 Wn. App. at 138 (2006).

Despite being combined into one element the terms "actual" and "uninterrupted" are distinct concepts. Actual possession is established only if possession is of such a character as a true owner would make considering the nature and location of the land in question. *Young v. Newbro*, 32 Wn.2d 141, 144-45, 200 P.2d 975 (1948), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853 (1984). One could possess property as the true owner periodically rather than uninterruptedly.

Open and notorious denote distinct concepts. "Open" has many definitions, but

4

the meaning befitting adverse possession is: "completely free from concealment: exposed

to general or particular perception or knowledge." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 1579 (1993). "Notorious" means: "widely and unfavorable

known or discussed for something reprehensible or scandalous or for some negative

quality or trait." WEBSTER'S, *supra*, at 1545.

Despite discrete meanings, Washington courts unify the two constructs of "open"

and "notorious" as if the words are synonyms. The open and notorious requirement is

met if (1) the true owner has actual notice of the adverse use throughout the statutory

period, or (2) the claimant uses the land so that any reasonable person would assume that

the claimant is the owner. *Chaplin v. Sanders*, 100 Wn.2d at 863 (1984); *Anderson v.

Hudak*, 80 Wn. App. 398, 404-05, 907 P.2d 305 (1995). No Washington case

distinguishes between "notorious" and "open."

Hostility remains an element of adverse possession. The element of hostility

became problematic in this appeal. Hostility requires that the claimant treat the land as

his own as against the world throughout the statutory period. *Chaplin v. Sanders,* 100

Wn.2d at 860-61; *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 50, 271

P.3d 973 (2012). Hostility is not personal animosity or adversarial intent, but instead

connotes that the claimant's use has been hostile to the title owner's, in that the

claimant's use has been akin to that of an owner. *Herrin v. O'Hern*, 168 Wn. App. at 311

(2012).

When courts illuminate the meaning of the various elements of adverse

possession, the meanings correspond. In other words, the elements meld. "Actual" possession is the exercise of dominion over the land in a manner consistent with actions a true owner would take. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 759, 774 P.2d 6 (1989). "Exclusive" is defined similarly to "actual," despite exclusive being an element distinct from actual. Exclusive possession denotes acts indicative of true ownership during the statutory period. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d at 759-80 (1989). In order to be exclusive for purposes of adverse possession, the claimant's possession need not be absolutely exclusive, but the possession must be of a type that would be expected of an owner under the circumstances. *Harris v. Urell*, 133 Wn. App. at 138 (2006); *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). "Open and notorious" possession also denotes use of the land as if the claimant is the owner. *Chaplin v. Sanders*, 100 Wn.2d at 863 (1984); *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 211-12, 936 P.2d 1163 (1997). "Hostile" requires a showing that the claimant treated the land as his own for the statutorily required period. *Acord v. Pettit*, 174 Wn. App. at 104 (2013).

Since all of the four traditional elements of adverse possession lead to the same end of showing possession of the property as if the true owner, the law would benefit by streamlining the doctrine. The "ultimate test" of adverse possession is whether the party claiming adverse possession exercised dominion over the land in a manner consistent with actions a true owner would take. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d at 759; *Timberlane Homeowners Ass'n, Inc. v. Brame*, 79 Wn. App. 303, 309-10, 901 P.2d 1074

6

(1995). The doctrine could be encapsulated in one understandable sentence: possession is adverse when the claimant possesses the property for ten years as the true owner would and asking no permission for such use. *Kunkel v. Fisher*, 106 Wn. App. 599, 602, 23 P.3d 1128 (2001). Such a rule may need refinement in individual circumstances, but, for the most part, the rule suffices. Because of the loose use of words and phrases, the four to seven habitual elements of adverse possession have unnecessarily led to volumes of cases explaining the law of adverse possession. The fixed elements do little, if anything, to add to the core test of adverse possession other than to add a jungle of mumble.

The evidence on appeal shows that appellants Aalgaard, at least for a portion of the disputed land, possessed the land as the true owner. Dave Aalgaard may have sought cooperation from Eric Deno to establish the boundary line, but Aalgaard did not ask permission in the sense that he sought Deno's consent to use Deno's property. Psychology, history, and case law provide no anecdotes of one neighbor granting another neighbor permission to build a home in part on the first neighbor's property.

I also question whether the law should protect one who intentionally steals another's property by exclusive possession over ten years and whether adverse possession should apply to undeveloped land. Neither of these factors are present here. The Aalgaards honestly believed they owned the land on which they built improvements, including their home, and the Supreme Court likely approved the theft of property in the landmark decision of *Chaplin v. Sanders*, 100 Wn.2d 853 (1984). The Aalgaard and Deno property had previously been designated as residential property and lay in a

7

No. 32908-9-III
*LeBleu v. Aalgaard*

condition of development.

I CONCUR:

_____
Fearing, J.

8